Howard W. HIXON et al., Plaintiffs in Error,

v.

SNUG HARBOR WATER AND GAS COMPANY, a Corporation, et al., Defendants in Error.

Arch LANCASTER, Jack Semore and F. J. Stine, Trustees of the Wagoner County Utilities Authority, Petitioners,

v.

The CORPORATION COMMISSION of the State of Oklahoma, Snug Harbor Water and Gas Company, a Corporation, et al., Respondents.

Nos. 39870 and 39949.

Supreme Court of Oklahoma.

April 30, 1963.

Yates Land, Elmer Adams, Tulsa, for plaintiffs in error and respondents, Howard W. Hixon, et al.

Crowe, Thieman & Froeb, Harry M. Crowe, Jr., Tulsa, for defendant in error, Snug Harbor Water and Gas Company.

James C. Harkin, Leon Hirsh, Paul Johanning, Oklahoma City, for petitioners, Trustees of Wagoner County Utilities Authority.

JACKSON, Justice.

Case No. 39,949 is an appeal by customers of Snug Harbor Water and Gas Company which goes to the merits of an order of the Corporation Commission approving the sale of the water system owned by said Company to the Wagoner County Utilities Authority, a trust created by citizens of

Wagoner County under the provisions of 60 O.S.1961, Sections 176 to 180, and the provisions of the Oklahoma Trust Act.

Case No. 39,870 is an original proceeding in this court by the trustees of the Authority, in which we are asked to assume original jurisdiction for the purpose of enjoining appellants in Case 39,949, supra, from proceeding with their appeal therein, upon the ground that no appeal under the usual statutory appellate procedures is authorized in that case.

For convenience we have consolidated the two cases on appeal and will first consider the question presented in Case No. 39,870 of whether an appeal may be taken by appellants (the customers) under the provisions of 12 O.S.1961 § 956.1 et seq., from the order entered in Case No. 39,949, supra. The theory of the trustees is that the Commission's action in approving the sale was a legislative, and not a judicial, function, and that no appeal under the procedure prescribed in the cited sections of the statute is authorized. They concede that the customers are entitled to a *judicial review* of the Commission's order, but argue that such must be obtained by certiorari, or other appropriate form of judicial review, and not under the statutory appellate procedures followed in an ordinary appeal to this court.

■ Although this argument might have some basis in early decisions of this court, it cannot be sustained in view of the 1941 amendments of certain sections of Article IX of the Oklahoma Constitution.

The constitutional basis of the jurisdiction and powers of our Corporation Commission was contained in Sections 18 through 34 of Article IX of the Oklahoma Constitution. By the terms of Section 35 of Article IX, the legislature was authorized to amend those sections, under certain restrictions, at any time after the first Monday in January, 1909.

· Constitutional provisions concerning appeals to the Supreme Court from decisions of the Corporation Commission were contained in Section 20 of Article IX, and in

many of the early decisions of this court, the review in this court of legislative actions of the Commission was termed a legislative review. This led to serious consequences undoubtedly not contemplated by the writers of our constitution, because of the due process requirements of federal and state constitutions, and in Corporation Commission v. Cary, 296 U.S. 452, 56 S.Ct. 300, 80 L.Ed. 324, the United States Supreme Court in effect affirmed an order of a federal district court enjoining the enforcement of a Commission order in a gas rate case, despite its prior affirmance in this court in a "legislative" review, upon the ground that the public utility company had no speedy and adequate remedy, by way of judicial review, under state law.

Shortly before the U. S. Supreme Court decision in Corporation Commission of Oklahoma v. Cary, 296 U.S. 452, 56 S.Ct. 300, 80 L.Ed. 324, but after the entry of the federal district court order there concerned (and thus too late to have a bearing on the U. S. Supreme Court decision) the Oklahoma Supreme Court took note of the situation in Oklahoma Cotton Ginner's Association v. State, 174 Okl. 243, 51 P.2d 327, and in a memorable opinion by Vice Chief Justice Osborn, pointed out the basic inconsistency between the concept of a legislative review in the Supreme Court on the one hand, and the fundamental doctrine of the separation of the powers of government on the other. In that case this court held unconstitutional that portion of the statute concerned which purported to invest the Supreme Court with legislative authority.

Apparently as a result of the Cotton Ginner's Case and Corporation Commission v. Cary, the Oklahoma Legislature in 1941 amended Sections 20, 21, 22, and 24 of Article IX, and repealed Section 23, all pursuant to its authority under Section 35 of that Article.

The amendment of Section 20 was such as to spell out in unmistakable terms the judicial character of Supreme Court review of Commission actions, and the manner in which the appeals shall be taken. That

section of the Constitution now provides in part as follows:

"From any action of the Corporation Commission prescribing rates, charges, services, practices, rules or regulations of any public utility or public service corporation * * *, an appeal may be taken by any party affected * * * directly to the Supreme Court of the State of Oklahoma, *in the manner and in the same time in which appeals may be taken to the Supreme Court from the District Courts,* except that such an appeal shall be of right. * * *

"The Supreme Court's review of appealable orders of the Corporation Commission shall be *judicial only* * * *." (Emphasis supplied.)

The above provisions of our Constitution are clear and unambiguous. By their terms, Supreme Court review of *any* action of the Commission (whether legislative or judicial) is judicial only, and the procedure to be followed in the appeal is the same as that used in appeals from the district courts. 12 O.S.1961 § 956.1 et seq., the procedural statutes followed by the customers in Case No. 39949, are the sections of the statute prescribing procedure to be followed in appeals from the district courts. The complaints of the trustees are therefore without merit.

The application to assume original jurisdiction, Case No. 39870, is dismissed.

We now consider Case No. 39,949 which involves the merits of the order of the Corporation Commission approving the sale of the water system by Snug Harbor Water and Gas Company to the Wagoner County Utilities Authority. In doing so, however, a factual background will be necessary in order to understand the problems presented. In the related case of Hixson, et al. v. Snug Harbor Water and Gas Co., et al., Okl., 381 P.2d 308, (a rate case between the same parties) it is shown that Snug Harbor Water and Gas Company began as an individual operation by Ed Wright prior to 1955. In order to supply water to the

owners of cabins, and others, in the Snug Harbor area of Fort Gibson Lake, Mr. Wright entered into water service contracts wherein the customers were required to pay "connection charges" ranging between $100.00 and $1,000.00, depending apparently on the length of the lines necessary to serve each customer. Several of the cabin owners or customers paid a connection charge of $350.00, and under their contracts were to have water at a rate of approximately $30.00 per year for a period of twenty years, from January 1, 1954.

Prior to February 1, 1955, Mr. Wright organized the Snug Harbor Water and Gas Company, a corporation, and the water facilities were transferred to the Company. On April 15, 1955, after the Corporation Commission assumed jurisdiction it established a minimum rate of $42.00 per year for residential properties and a "connection charge" of $350.00 in some areas and lesser amounts in other areas. No appeal was taken from that order.

In 1960 Snug Harbor Water and Gas Company filed an application for an increase in rates and after extensive hearings which were concluded on July 13, 1960, the Commission determined that the total net value of the system was $113,323.58. It also found that the customers had paid $55,575.66 in the form of "connection charges"; it subtracted that amount (as in aid of construction) from the net value of the system, and held that Snug Harbor Water and Gas Company's contribution to the venture was $57,343.53, and utilized that figure as the "rate base" on which to establish a water rate. See Hixon, et al. v. Snug Harbor Water and Gas Co., supra. The new rate structure required that new customers added to the system pay a "uniform connection charge of $200.00" in lieu of excess costs for extensions and a minimum of $72.00 per year for water service to residential properties.

This historical and factual background brings us to the present controversy wherein Snug Harbor Water and Gas Co., (hereinafter called the Company) in August,

1961, filed an application with the Corporation Commission for an order authorizing it to sell its water system to the Wagoner County Utilities Authority. At this hearing the evidence shows that the Company had added additional improvements to its system costing at least $80,000.00 and had entered into a contract with the Wagoner County Utilities Authority for the sale of the system to it for the total sum of $230,000.00. The Corporation Commission, recognizing that protestants, as customers, had contributed sums of money approaching $60,-000, as in aid of construction in the form of "connection charges", entered an order on October 10, 1961, in material part, as follows:

"(2) that said proposed sale is not contrary to the public interest and should be approved by the Commission subject to the affording of protection, pending final determination, of the claims hereinafter set forth; (3) that there presently is pending, in the Supreme Court of Oklahoma, an appeal by the protestants from Order No. 43653 of the Commission, in Cause No. 22389, (Being the related case of Hixon, et al., v. Snug Harbor Water and Gas Co., et al., No. 39,480, Okl., 381 P.2d 308, heretofore referred to in this opinion.) in which Order the Commission approved the charging by the Applicant of a uniform connection charge to customers of said water system, that protestants announced at the hearing that they were contesting said connection charge in said appeal and that if they should prevail in said appeal the protestants are asserting an equitable lien on the assets of the Applicant for the refund of the amount of said connection charges collected by it and that said sum does not exceed a total sum of $60,000.00; and therefore (4) that should the sale be consumated prior to final determination of the validity of protestant's claims, the sum of $60,000.00 in cash out of the proceeds of the sale, should be sequestered

to be available for payment to those finally determined to be entitled thereto.

ORDER

"IT IS, THEREFORE, THE ORDER OF THE COMMISSION:

"1. That the Application of Snug Harbor Water and Gas Company, a corporation, for approval of sale of its water distribution system to the Wagoner County Utilities Authority, a public trust, pursuant to the Contract for sale submitted to the Commission, be, and the same is hereby approved subject only to the hereinafter provisions of this Order.

"2. That if the claims of the protestants for refund of the connection charges collected by applicant shall not have been finally determined adversely to the protestants prior to consummation of said sale, the Applicant shall deposit in escrow in The First National Bank and Trust Company of Tulsa, Oklahoma, the sum of $60,000.00 in cash out of the proceeds of said sale, the condition of said deposit in escrow to be that upon final adjudication of the claim of the protestants, in the pending appeal in the Supreme Court of Oklahoma from Order No. 43653 of the Commission (See Hixon, et al., v. Snug Harbor Water and Gas Co., supra) to the refund to customers of Snug Harbor Water and Gas Company of connection charges collected by said Company, the said bank and trust company shall disburse said deposited money to the persons so adjudicated to be entitled thereto and to pay to the Snug Harbor Water and Gas Company any sum remaining after disbursements to others as aforesaid."

It is from the quoted order that Protestants bring this appeal.

At the time we wrote and promulgated our opinion in the rate case, Hixon v. Snug Harbor Water and Gas Co., supra, and approved "a uniform connection charge of $200.00" we were fully aware of the Com-

mission's order in the instant case. However, since that case involved the validity of a "rate schedule", and nothing more, the quoted order in the instant case was not material in the rate case.

In the instant case the sale of the water system has been approved for $230,000.00. The evidence in this case shows that Protestants have invested in this system in the form of "connection charges" in aid of construction an amount of money of not less than $55,575.66. In addition thereto it is entirely probable that additional sums have been contributed since the Commission established a uniform connection charge of $200.00 in the rate case. As noted in our rate case, Hixon v. Snug Harbor Water and Gas Co., supra, we approved the "connection charge" for the reason that a contribution to the cost of construction would necessarily reduce the monthly or annual rate that would be required for the operation of the system. So long as the Company operates the system under rate schedules authorized by the Commission these contributions to cost of construction undoubtedly would have been utilized to reduce the cost of water service to the customer, as was done in the Hixon case, supra. If the Company is permitted to sell the system to Wagoner County Utilities Authority for $230,000.00, without taking into account the contributions which have been made by the customers to the capital investment, then it is apparent that the Wagoner County Utilities Authority will be obligated to collect, and a district court will be compelled to approve, a sufficient revenue from the system to retire a $230,000.00 indebtedness plus a sufficient revenue to pay interest on a $230,000.00 debt. This money to retire the capital investment of $230,000.00 must necessarily come from the customers in the form of water rates to be charged by the Wagoner County Utilities Authority. In this connection it has been observed that all customers connected to the system have already made substantial contributions to the capital investment. If the sale is made without

taking into account the contributions which have heretofore been made then it will be necessary that all existing customers make an additional contribution to the capital investment in the form of rates for water service, or, in the alternative, unusually heavy "connection charges" must be imposed upon new customers.

There is testimony in this case to the effect that the Wagoner County Utilities Authority will be able to operate the facility, retire a bonded indebtedness of $230,000.00 and pay the interest out of the rate structure heretofore promulgated by the Commission. If we accept this as true, it still follows that those who have made contributions to the capital investment are entitled to have their investments utilized in the reduction of rates, for otherwise these "connection charges" could not have been approved in the rate case.

The basic question in this case is: Who is entitled to "connection charges", or "contributions to construction costs", paid by customers to a public utility for construction of water lines in a sparsely settled rural area, when because of a sale by the utility of the system it will no longer be possible for the customers to have the benefit of reduced rates which they have purchased by their capital investment? The question presented appears to be of first impression in this jurisdiction.

The general rules and regulations for water companies under the jurisdiction of the Corporation Commission are contained in General Order No. 16631, promulgated by the Commission on September 30, 1943. Under Rule 32 of Order No. 16631, water companies are required to furnish free the first 60 feet of any extension of the water mains required to serve a new customer. Rule 32 also provides that, in furnishing service *within the corporate limits of any city or town*, the utility may require the prospective customer to deposit an amount equal to the cost of the main extension above the free limit. The rule further provides, however, that such deposit must be refunded in an amount equal to the cost

of the extension per consumer, as each new customer is added to the line. It further provides that at the end of five years, any unrefunded portion of the original deposit shall accrue to the company as partial compensation for the maintenance and operation of the extension during the five year period.

The provisions as to the refund of the original deposit, and the accrual of unrefunded portions of the original deposit to the company after five years, appear from the rule to be applicable only to extensions within a city or town, and there are no comparable provisions as to water service furnished in a sparsely settled rural area such as is involved in this case.

Since 1955 the Company has been operating under Commission-approved rate schedules calling for uniform connection charges in lieu of excess cost for extensions as provided in the general rules, with no refund or accrual provisions. In other words, we have an isolated case not governed by any general or comparable rule of the Corporation Commission.

While we have found no case from the appellate courts of other jurisdictions dealing with the precise problem presented, very similar problems have been considered by public utility regulatory bodies.

In In Re Wisconsin Power and Light Company, P.U.R. 1933B, 334, the Wisconsin Public Service Commission considered the complaints of some utility customers as to alleged discriminatory treatment. The company involved had had a rate schedule containing provisions substantially similar to Rule 32 of General Order No. 16631. Under the schedule, new customers whose service required an extension of the mains were required to deposit the cost of the extension, with the deposit being refunded as other new customers were added to the line. Later, apparently as a promotional measure, the company adopted a policy of paying the entire cost of the extensions itself, and no deposit was required of new customers. The result was that while an old customer might still have a substantial sum tied up with the company in an unrefunded deposit, or a partially refunded deposit, his neighbor, on another extension, would have no funds on deposit at all. In this situation, the Commission required the company to refund immediately all remaining deposits in its hands, in order to eliminate discrimination and place all customers "on an equal basis".

In In Re Merchantville Water Company, P.U.R. 1926D, 378, the New Jersey Board of Public Utility Commissioners considered a situation very closely in point on the facts, except that refund provisions were involved. The Merchantville Water Company petitioned the Board for approval of the sale of its water system to the Merchantville-Pensauken Water Commission. At the time, the company had on hand about $100,000 it had collected from customers as deposits for main extensions, and these funds were in process of being refunded under a plan similar to that prescribed by Rule 32 of Order No. 16631. The company proposed to turn these funds over to a trust, to be refunded to the customers as the refunds were "earned" under the plan, while the water system was being operated by the new owners. The Board pointed out, however, that the sale price included the value of the main extensions, and required, as a condition for approval of the sale, that refunds in full be made to all customers.

It will be seen that the decision in the Wisconsin case was expressly grounded upon the necessity of preventing discrimination by keeping the customers of the utility "on an equal basis". The same basis may be implied for the New Jersey decision, though it is not expressly stated therein.

■ It is well settled that a public utility or public service corporation has a broad general duty to serve the public without unjust discrimination. Am.Jur. Public Utilities and Services, Sections 22, 47 and 171. In this jurisdiction, the duty of regulating such companies is imposed by law upon the Corporation Commission. Oklahoma

320

Constitution, Article IX, Sections 18 to 34; 17 O.S.1961 § 1 et seq. It would seem that in the discharge of its duties in determining whether a proposed sale of a public utility will be approved or disapproved, the Commission would have a right, if not a duty, to consider the question of whether discrimination would result. It apparently did so in this case; its order required that in case of consummation of the sale before the rights of all parties were finally determined in the Supreme Court, $60,000 should be deposited in escrow for the protection of the customers who paid the connection charges.

■ While we have considered the possibility of approving the sale for $230,000.-00, less the amount of customer contributions to the investment, we have concluded that the most satisfactory solution is the one utilized in the cited Wisconsin and New Jersey cases. That is, to require Snug Harbor Water and Gas Company, as a condition for approval of the sale, to refund all connection charges which have been paid. The result would be that all customers, both present and future, would receive equal treatment insofar as rates are concerned; that is, their water rates after the sale would include a return on the same investment ($230,000.00). This seems to be the only satisfactory solution since it appears from the record that former "connection charges" imposed by private contracts and Commission Orders will not result in complete equality of treatment unless these deposits are taken into account.

■ It is suggested in the briefs that the Commission does not have equitable jurisdiction or authority to adjust the purely private contract rights of the customers and the company under the contracts executed before the Commission began to exercise its jurisdiction of the Company in 1955, and we assume that this is true. It is equally well settled, however, that the regulatory powers of the Commission cannot be defeated by private contracts between the

utility and the customer. Shaffer Oil and Refining Co. v. Creek County Gas Co., 114 Okl. 258, 246 P. 630; Southern Oil Corp. v. Yale Natural Gas Co., 89 Okl. 121, 214 P. 131, affirmed 45 S.Ct. 97, 266 U.S. 583, 69 L.Ed. 453. In requiring the refund of the connection charges the Commission would be acting pursuant to its authority and duty to prevent discrimination as between present and future customers of the public utility, and not under any supposed power to adjust private contract rights. In addition, it should be noted that the private contracts involved herein were executed *after* the state legislature had enacted 17 O.S.1961 § 151 et seq., under which, jurisdiction of water companies as public utilities, was conferred upon the Commission.

The order of the Commission in case number 39949 (the sale approval case) is is not sufficient to protect the rights of existing and prospective customers from the standpoint of discrimination in rates, although the requirement that $60,000 be placed in escrow pending a final determination of the rights of the parties in case of the prior consummation of the sale was a step in that direction. The record before us does not show whether the sale was completed, or whether the escrow deposit was actually made.

The Order approving the sale is therefore reversed and the cause is remanded to the Commission with directions to approve the sale only after requiring of Snug Harbor Water and Gas Company sufficient guarantees in cash, by bond, or otherwise, that the company will refund all connection charges received by it prior to the sale, whether imposed by private contract or by orders of the Commission, within such time before or after approving the sale as may appear reasonable under the circumstances.

BLACKBIRD, C. J., HALLEY, V. C. J., and WELCH, DAVISON, JOHNSON, IRWIN and BERRY, JJ., concur.