The CITY OF SOUTH BEND, The Common Council of South Bend, The Board of Public Works of South Bend, Respondents-Appellants,

v.

The USERS OF the SEWAGE DISPOSAL FACILITIES OF CLAY UTILITIES, INC., the Users of the Waterworks Facilities of Clay Utilities, Inc., Petitioners-Appellees.

No. 2–179A12.

Court of Appeals of Indiana, First District.

April 1, 1980.

Leslie Duvall, Duvall, Tabbert, Lalley & Newton, Indianapolis, for respondents-appellants.

Daniel A. Manion, Doran, Manion, Boynton, Kamm & Esmont, South Bend, for petitioners-appellees.

RATLIFF, Judge.

## STATEMENT OF THE CASE

The City of South Bend, its Common Council, and its Board of Public Works (the City) bring this appeal after the Public Service Commission, in response to petitions filed by the users of the waterworks facilities and the sewage disposal facilities of Clay Utilities, Inc. (the users), found that the lease rental payments established in two lease purchase agreements entered into by the City and by Clay Utilities, Inc. were unfair and unreasonable.

## FACTS

Clay Utilities, Inc. is an Indiana corporation which provides water and sewage disposal services for certain urban areas lying outside the city limits of South Bend. On October 24, 1977, the Common Council of the City of South Bend adopted an ordinance approving the lease and purchase of the sewage disposal facilities of Clay Utilities, Inc. by the City of South Bend pursuant to IC 1971, 19–2–5.5 (Burns Code Ed., Supp.1979). On that same date the Common Council also adopted an ordinance approving the lease and purchase of the waterworks facilities of Clay Utilities, Inc. by the City of South Bend pursuant to IC 1971, 19–2–11.5 (Burns Code Ed., Supp. 1979).

Certain users of the utility services filed petitions with the Public Service Commission alleging that the lease rental payments which had been approved by the Common Council were neither fair nor reasonable. The Public Service Commission subsequently conducted a lengthy hearing. Evidence adduced at the hearing showed that Murphy Engineering, Inc. had appraised the facilities of Clay Utilities, Inc. and had listed the present-day worth of those facilities as $2,126,270.00. As of December 31, 1977, the updated original cost of the total utility plant was $1,710.830.00, with accumulated depreciation of $122,686.00, leaving a net utility plant value of $1,588,144.00. Of that $1,588,144.00, the sum of $1,241,164.00 represented contributions in aid of construction. The Public Service Commission ultimately held that the lease rental payments of $162,630.00 annually, for a total of $1,907,292.00, were not fair or reasonable.

## ISSUES

1. Were the users' petitions timely filed with the Public Service Commission?

2. Did the Public Service Commission err in concluding that the lease rental payments were unfair and unreasonable?

3. Did the Public Service Commission erroneously disregard certain expert testimony which was provided by the City?

4. Did the Public Service Commission ignore certain presumptions and erroneously impose upon the City the burden of proof?

5. Did the Public Service Commission enter findings which were sufficient to sustain its Order?

6. Are the findings of the Public Service Commission supported by substantial evidence?

## STATUTORY PROVISIONS

IC 19–3–11.5, in general, provides for the leasing, operation, and acquisition of waterworks facilities by municipalities. According to IC 19–3–11.5–2:

"Any municipality shall have the power to lease waterworks facilities from a public utility and to operate the same in conjunction with the operation of its municipally owned waterworks whether such facilities are located within or without the corporate territory of such municipality; Provided, however, That the area served by such waterworks facilities outside the corporate territory shall be contiguous to, or within one [1] mile from, one [1] of the corporate boundaries of the municipality. Any municipality so leasing and operating such waterworks facilities shall, insofar as the annexation laws of the state are concerned, be deemed to be furnishing water service to the area annexed or to be annexed."

IC 19–3–11.5–4 imposes solely upon the users of the leased facilities the duty to pay the obligations so incurred by the municipality:

"Such contract of lease may provide that as a part of the lease rental from the waterworks facilities, the lessee shall agree to pay all property taxes and assessments levied against or on account of the leased facilities and to maintain insurance thereon for the benefit of the lessor and may also provide that the lessee shall assume all responsibilities for the operation, maintenance, repair, alterations, additions and extensions of the leased facilities; Provided, however, that all of the foregoing and the lease rental

shall be payable solely from the revenues derived from water rates and charges to be collected by the lessee from property and users in the area served by the leased facilities."

IC 19–3–11.5–5 offers these guidelines for rates:

"The lessee shall be authorized to establish, fix, bill, and collect such rates and charges with respect to the property and users in the area served by the leased facilities as shall be sufficient to pay the costs of operation, maintenance, repair, alterations, depreciation, additions and extensions of the leased facilities, and to pay the lease rental as the same becomes due. Rates too low to meet the foregoing requirements shall be unlawful. * * *"

When the municipality and the public utility have reached agreement upon the terms of such a lease, notice must be given by publication to all interested persons and a hearing must be held. Following the hearing, the Common Council may either authorize the execution of the lease as previously negotiated or make modifications as agreed upon by the municipality and the public utility. IC 19–3–11.5–6.

If the Common Council authorizes the execution of a lease, a notice of the signing of the contract must be given by publication. Fifty or more users served by the existing municipally owned water utility, or fifty or more users served by the facilities to be leased may file a petition with the Public Service Commission for determination by the Public Service Commission as to whether the lease rental is fair and reasonable. IC 19–3–11.5–7. Any such action to contest the validity of the lease must be instituted within thirty days after publication of the notice of the execution of the lease. IC 19–3–11.5–8.

A comparable procedure for the leasing, operation, and acquisition of sewage disposal facilities appears in IC 19–2–5.5.

## DISCUSSION AND DECISION

*Issue One*

■ The City argues that the Public Service Commission should have dismissed the petitions filed by the users because those petitions were not filed within thirty days after publication of notice, as IC 19–3–11.5–8 and IC 19–2–5.5–8 require.

The evidence reveals that the thirtieth day fell on Sunday. The users filed their petitions on Monday, the thirty-first day.

In *Ball Stores, Inc. v. State Board of Tax Commissioners,* (1974) 262 Ind. 386, 316 N.E.2d 674, our Supreme Court held that, when the final day of a statutory thirty-day period within which a taxpayer was required to give notice of an appeal from a property assessment expired on a day when the office of the Board of Tax Commissioners was closed for business, the statutory period was extended to the next day on which the Board's office was open for business. Justice Hunter wrote at page 389 of 262 Ind., at page 676 of 316 N.E.2d:

"* * * Every conceivable element of fair play, common sense and logic mandates that the taxpayer be afforded the full thirty days to complete his appeal to the courts. The Board should either make provisions for the actual receipt of such notices on the thirtieth day or recognize that when such receipt is impossible (e. g., *because of the closing of its offices* and/or the nondelivery of the United States mails on Sundays and holidays), receipt on the next business day is a timely receipt of notice—particularly when the taxpayer's inability to make delivery of such notice is beyond his control." (Our emphasis.)

Justice Hunter concluded that the situation was governed by Ind.Rules of Procedure, Trial Rule 6(A).

The City emphasizes that in *Ball Stores* the appeal had been filed within thirty days but the Board simply had not received notice within thirty days. Justice Hunter, however, spoke in terms of completing the appeal by giving the notice. The present case cannot be distinguished from *Ball Stores* on that basis.

Neither the applicable statutes nor the rules of the Public Service Commission pre-

scribe a manner for computing the thirty-day period. Accordingly, the Public Service Commission properly decided the issue by relying upon T.R. 6(A). We hold that the Public Service Commission correctly refused to dismiss the users' petitions which were filed on the thirty-first day.

*Issue Two*

■ The City argues that the Public Service Commission erroneously concluded that the lease rental payments were unfair and unreasonable.

According to the City, "[t]he purchase price upon which the lease rental is computed had to be reasonably related to the actual fair market value of the plant being acquired—nothing more and nothing less." The City insists that the negotiated price represents the plant's actual fair market value.

A witness who appeared on behalf of the City defined fair market value as that amount which a willing seller would accept in exchange for his property and which a willing purchaser would pay for the property. Before negotiating a final purchase price, however, certainly a prospective purchaser would investigate the quality of the facilities, the earnings potential, and the likelihood of additional major expenditures necessitated by the purchase.

Ceasar Stravinski, an engineer employed by Murphy Engineering, Inc., testified on behalf of the City. Stravinski stated that the City had retained Murphy Engineering, Inc. to provide an evaluation of the present-day worth of the sewer system and water system of Clay Utilities, Inc. Stravinski, who was in charge of that assignment, had previously made no similar evaluations for any utility systems.

Stravinski first determined the original cost of the various facilities. He then updated the cost to the date of December 31, 1976, by use of the Handy-Whitman Index. That figure was then depreciated by one and one-half percent per year for the period of time which the particular facility had been in use. In this way Stravinski arrived at a value of $2,126,270.00 for the waterworks and sewage disposal facilities.

Stravinski testified that no one from Murphy Engineering, Inc. had made any inspection with regard to the quality of the installation or the service provided. He stated that he would place the same value on the facilities regardless of whether or not the facilities were adequate for the purpose intended. He also testified that he considered contributions in aid of construction to be irrelevant in calculating the worth of the facilities.

Thomas Meyn, a certified public accountant, stated that he strongly questioned the valuation. Meyn testified: "I use, as an example, Indianapolis Water Company which sells at approximately eleven times net earnings. The proposed sale of Clay Utilities is approximately nine times gross revenues." Meyn testified that, "[i]f you were to base a purchase price on the earnings record it would be virtually nothing." Herschell Umbaugh, who also is a certified public accountant, testified that at the end of 1976 Clay Utilities, Inc. appeared to have an earnings deficit rather than an earnings surplus.

Edwin Voss, a civil engineer, noted expenditures of more than $500,000.00 that he deemed necessary in order to solve water pressure problems and to expand the sewer system as contemplated.

Such evidence as this demonstrates that the appraisal prepared by Murphy Engineering, Inc. does not possess the persuasiveness or decisiveness which the City seeks to ascribe to it.

Furthermore, the City is not the typical willing purchaser who negotiates a purchase price at fair market value. Certainly a part of this concept of fair market value is the basic proposition that the willing purchaser will reach into his own pocket to pay the price which he negotiates to his satisfaction. The City of South Bend, however, looks solely to the users, who reside outside of the city limits, to pay the price which the City determines is appropriate.

At the center of the present controversy is the fact that the Public Service Commission deemed the lease rental payments un-

fair and unreasonable because the negotiated price totally ignored contributions in aid of construction. Witness Umbaugh stated that "contributions in aid of construction" is an account which includes donations or contributions in cash, services, or property from states, municipalities, governmental agencies, individuals, and others for construction purposes. The following explanation appears in *State ex rel. Utilities Commission v. Heater Utilities, Inc.,* (1975) 288 N.C. 457, 219 S.E.2d 56, 58–9:

> "A typical 'contribution in aid of construction' occurs under the following circumstances: An individual or group of individuals desiring service from a water, gas, electric, telephone or other public utility company is located so far from the company's existing main or line that the company is unwilling to bear the expense of constructing the necessary extension of its facilities and the regulatory commission is unwilling or unable to compel it to do so. The company agrees to render service if the person or persons desiring it will pay all or part of such cost of construction. This they do, title to the newly constructed facility passing to the company which, expressly or impliedly, agrees to use such facility in supplying service to such patrons and their successors in interest. The facility so constructed is thereafter used and maintained by the company just as are similar facilities constructed entirely with company funds, the cost of such maintenance being a proper operating expense of the company.

The amount so paid by the patron or patrons for the construction of the facility is entered on the books of the company under the caption, 'Contributions In Aid of Construction,' or some similar designation."

In Indiana, as well as in many other states, the Public Service Commission deducts the contributions in aid of construction when it determines the rate base. *Re Indiana Gas & Water Co., Inc.,* (Ind. Public Service Commission 1960) 35 P.U.R.3d 32. The Court of Appeals of Maryland acknowledged in *City of Hagerstown v. Public Service Commission,* (1958) 217 Md. 101, 141 A.2d 699, at 702, that this deduction is made because of " . . . the proposition that the customers of a public service company should not be called upon to pay rates which would yield a return to the company on property for which they or others, but not the public service company, have paid." [1]

Testimony in the case at bar reveals that, when one privately owned utility is purchased by another private investor, the account for contributions in aid of construction continues in existence and will therefore be recognized when rates subsequently are considered by the Public Service Commission. If a private investor contemplating the lease/purchase of the facilities of Clay Utilities, Inc. determined that the plant value was $1,588,144.00 [2] or even $2,126,270.00, [3] would that private investor pay $1,907,292.00 when $1,241,164.00 of that

1. Judge Staton wrote in *L. S. Ayres & Co. v. Indianapolis Power & Light Co.,* (1976) Ind. App., 351 N.E.2d 814, 819:

   " * * * The Commission's primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. * * * " (Citations omitted.)

   Judge Staton explained that the Public Service Commission must first determine what the future revenue requirements of the utility are. After explaining how that determination is made, he wrote at page 820:

   "After the utility's existing level of earnings or 'return' is established, the amount of investment in utility operations—the 'rate

   base'—is determined by adding the net investment in physical properties to an allowance for working capital. *The 'rate base' consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the 'return' is to be earned.* * * * " (Footnote omitted.) (Our emphasis.)

2. This amount represents updated original cost less accumulated depreciation.

3. Murphy Engineering, Inc. found that the waterworks facilities and sewage disposal facilities had a combined present-day worth of $2,126,270.00.

purchase price would be deducted in calculating the rate base?

The City offers the following argument:

"In a transfer from one investor owned utility to another of items in the plant account, it is necessary that contributions follow the account so that there will not be a stepped up basis for rate-making purposes with a second utility. None of these considerations have any relevance in transfer of plant to a municipal utility. Municipal utilities under the general statute and also under the specific statutes relevant to these proceedings must structure its rates based generally on operating expenses as statutorily defined. Rate base has no relevance to these proceedings."

Reference to IC 19–3–11.5–4 and IC 19–2–5.5–4 makes this argument difficult to appreciate. Those sections provide that the lease rental payments are payable solely from those revenues derived from the rates and charges collected by the municipality from property and users in the area being served by the leased facilities. Rates which are too low to pay the costs of operation, maintenance, repair, alterations, depreciation, additions, and extensions of the leased facilities, and to pay the lease rental are unlawful. If the City makes a commitment to pay Clay Utilities, Inc. $1,907,292.00, obviously the rates for the users must be higher than the rates would have to be if the price were $1,000,000.00 or $500,000.00.

The City's reasoning leaves the value of the plant dependent solely upon whether a private investor purchases it or whether a municipality purchases it pursuant to IC 19–2–5.5 and IC 19–3–11.5. The private investor, who reaches into his own pocket for the purchase money, can earn no return on the contributions in aid of construction and will assess the value of the utility accordingly. The municipality, which looks not to itself but rather to the users for payment of the purchase price (the very persons who directly or indirectly made the contributions in aid of construction), can make whatever charges are necessitated by the lease purchase agreements and conveniently can assess the value from a viewpoint which is significantly different from that of the private investor.

In *Hixon v. Snug Harbor Water & Gas Co.*, (Okl.1963) 381 P.2d 313, approval had been given for the sale of a water system owned by Snug Harbor Water and Gas Company to Wagoner County Utilities Authority. An issue remained concerning the sale price. We quote from page 318:

"In the instant case the sale of the water system has been approved for $230,000.00. The evidence in this case shows that Protestants have invested in this system in the form of 'connection charges' in aid of construction an amount of money of not less than $55,575.66. * * If the Company is permitted to sell the system to Wagoner County Utilities Authority for $230,000.00, without taking into account the contributions which have been made by the customers to the capital investment, then it is apparent that the Wagoner County Utilities Authority will be obligated to collect, and a district court will be compelled to approve, a sufficient revenue from the system to retire a $230,000.00 indebtedness plus a sufficient revenue to pay interest on a $230,-000.00 debt. This money to retire the capital investment of $230,000.00 must necessarily come from the customers in the form of water rates to be charged by the Wagoner County Utilities Authority. In this connection it has been observed that all customers connected to the system have already made substantial contributions to the capital investment. If the sale is made without taking into account the contributions which have heretofore been made then it will be necessary that all existing customers make an additional contribution to the capital investment in the form of rates for water service, or, in the alternative, unusually heavy 'connection charges' must be imposed upon new customers."

The court in *Hixon* recognized two possible solutions: approve the sale for $230,000.00 less the amount of contributions, or require the seller utility to refund all such contributions.

We are not persuaded that the City of South Bend is a typical willing purchaser, nor are we led to the conclusion that the negotiated price represents fair market value.

The City asks this court to consider the fairness and reasonableness of the lease rental payments using principles which govern eminent domain powers. Article I, § 21, of the Indiana Constitution provides that a person's property may not be taken by law without just compensation. In most condemnation proceedings, the just compensation is determined by ascertaining market value of the property. *Onondaga County Water Authority v. New York Water Service Corp.*, (1955) 285 App.Div. 655, 139 N.Y.S.2d 755.

The New York court recognized in *Onondaga County Water Authority, supra,* that market value is a standard difficult with which to work when it is a public utility which is condemned. This is true because there simply is not a market, in the usual sense, for a public utility. Therefore, in order to determine an amount which represents just compensation, resort frequently must be made to other standards. The standard used, in each instance, depends upon the particular circumstances. *Re Aldercroft Heights County Water District,* (Cal. Public Utilities Commission 1965) 60 P.U.R.3d 227; *Onondaga County Water Authority, supra.*

The court in *Onondaga County Water Authority, supra,* first emphasized that original cost and present value are not synonymous terms. The court then wrote at page 763:

"Evidence of reproduction cost less depreciation is more widely employed as the test of value for condemnation, although by no means conclusive. * * * The chief objection to this approach is that, used exclusively, it cannot value the intangible factors; *it also ignores what might well be a great disparity between earnings of a utility and replacement of physical assets.* * * * " (Citations omitted.) (Our emphasis.)

In *Kennebec Water District v. City of Waterville,* (1902) 97 Me. 185, 54 A. 6, the court held that evidence of the actual cost of the utility plant, together with allowances for depreciation, was competent evidence on the issue of present value, but this evidence was not conclusive or controlling.

In the case *Re Village of Mount Horeb,* (Wis. Public Service Commission 1936) 14 P.U.R. (n.s.) 181, the Village of Mount Horeb gave notice of its intention to acquire the property of two utility companies which were operating in the village. The Wisconsin Public Service Commission wrote at pages 185–86:

"In fixing the just compensation in this case, we have deducted from the estimates of the reproduction cost new of the property subject to acquisition an amount of $7,490, constituting contributions made by customers of the Companies and used by the Companies in constructing the property which is to be acquired by the village. * * * The title to this property is in the Companies, but it is subject to certain rights of those persons who contributed the funds necessary to construct it. One of those rights is that the utility operating such property is not entitled to include the amount of such contributions in the fair value of all of its property for rate-making purposes. When the municipality takes over the property of the Companies, including this property constructed with customer contributions, the rights of the contributors still obtain, and the fair value, for rate-making purposes, of the property acquired by the municipality from the Companies cannot include the amount of such contributions. Utility property upon which the owner is not allowed to earn any return, and which it could not sell or dispose of without incurring an obligation to replace it, has merely a nominal value. In effect, the Companies have already been paid for their property to the extent of any customer contributions; and just compensation should not include any allowance which would, in effect, permit the Companies to be paid a second time for the same property. * * * "

The City contends that the reasoning set forth in *Mount Horeb* has no application to the present case because the Wisconsin municipality was subject to rate restrictions but the City of South Bend can charge whatever amounts are necessary to pay all expenses. Nevertheless, *Mount Horeb* demonstrates that the contributed property carries with it certain restrictions which bear upon just compensation—the utility could not sell or dispose of the contributed property without incurring an obligation to replace it. *Mount Horeb* also emphasizes the inequity of granting the utility double payment while imposing upon the users the duty to pay twice.

We acknowledge that this brief consideration of condemnation principles constitutes *obiter dictum* in this opinion. The City of South Bend did not institute eminent domain proceedings. The City of South Bend elected to follow the statutory procedure provided by IC 19–3–11.5 and IC 19–2–5.5. A careful review of the evidence leads us to the firm conclusion that the lease-purchase agreements negotiated by the City of South Bend would be repugnant to a private investor, and they are likewise repugnant to the users who must pay the negotiated price.

The City of South Bend made no effort to conceal its motive in negotiating the lease-purchase agreements. While we do not consider its motive relevant to the issues presented by this appeal, neither do we fault the City for its annexation ambitions or its efforts. We simply hold that, based upon the particular facts and circumstances, the Public Service Commission properly concluded that the lease rental payments were not fair or reasonable.

*Issue Three*

The City argues that the Public Service Commission disregarded expert testimony on the issue of whether the lease rental payments were reasonable and fair.

■ A trier of facts has every right to weigh the testimony of an expert witness along with all other evidence which it receives. *Dudley Sports Co. v. Schmitt*, (1972) 151 Ind.App. 217, 279 N.E.2d 266. A

trier of facts is not bound by the opinion of an expert witness. *Temple v. Temple*, (1975) 164 Ind.App. 215, 328 N.E.2d 227.

The City has not demonstrated error.

*Issue Four*

■ The City argues that the Public Service Commission was serving in an appellate role, that it had a duty to recognize a presumption that the Common Council's action was correct, and that the Public Service Commission failed to employ this presumption. The City places particular emphasis upon IC 19–3–11.5–8, which speaks of an appeal to the Public Service Commission.

IC 19–3–11.5–7 and IC 19–2–5.5–7 provides that "the public service commission shall fix a time and place for the hearing on whether the lease rental is fair and reasonable . . . ." The users, as the petitioners, had the burden to demonstrate with their evidence that the lease rental was not fair and was not reasonable. The record reveals that the users met that burden. The record also reveals that the City had abundant opportunity to go forward with its evidence. Our examination of the record leads us to the conclusion that the Public Service Commission provided a hearing in the form contemplated by IC 19–3–11.-5–7 and IC 19–2–5.5–7.

*Issue Five*

■ The City argues that the Public Service Commission failed to make specific findings on all factual determinations material to its ultimate conclusions. The City refers to the following statement in *L. S. Ayres & Co., supra*, at page 822:

"* * * When the Commission provides the reviewing court with basic findings of fact on all issues material to its decision, its expert reasoning process and subtle policy judgments provide an intelligible framework for the judicial non-expert. Since 'basic findings' afford a rational and informed basis for review, the danger of judicial substitution of judgment on complex evidentiary issues and policy determinations is substantially reduced." (Citations omitted.)

In its findings the Public Service Commission explained that it was assessing the fairness and reasonableness of the lease rental provisions as those provisions related to (1) the lessor public utility, (2) the lessee municipality, (3) the users in the municipality served by the municipally owned utility, and (4) the users served by the utility facilities to be leased. The Commission painstakingly set forth the amount of the lease purchase obligations annually and the total payments including interest. In its findings the Public Service Commission noted the value of the utility facilities as demonstrated by the testimony and by the annual report of Clay Utilities, Inc., and it also listed the amount of contributions in aid of construction. The Commission found that Murphy Engineering, Inc. had been employed by the City to prepare an evaluation of present-day worth of the utility systems, and the Commission set forth the results of that evaluation and the method of computation used by Murphy; the Public Service Commission also noted certain considerations which the Murphy evaluation excluded, such as contributions in aid of construction and the physical condition of the facilities. The Commission acknowledged the relevant statutory provisions for establishing rates if the lease rental payments were found to be fair and reasonable. In its finding number thirty-six the Public Service Commission found that the total disregard of contributions in aid of construction " . . . would result in the users of the utility paying a second time for that part of such purchase price that is represented by assets funded by contributions in aid of construction." The Commission found that the evidence was in conflict as to whether users' rates would have to be increased if the lease-purchase agreements became effective, but it found "[t]hat regardless of which position in regard to future rates is correct, the level of rates will be higher than they otherwise would be if the proportionate part of the system represented by contributions in aid of construction were not included in the purchase price and the resulting lease-rental payment."

The Public Service Commission has provided basic findings of fact on all issues material to its decision.

*Issue Six*

 The City contends that the findings are not supported by substantial evidence.

Throughout these proceedings the City has tended to view the issue as one of whether or not sufficient money could be made available to meet the lease rental obligations. IC 19–3–11.5–5 and IC 19–2–5.5–5 provide a simple answer to that question. The Public Service Commission correctly viewed the issue as one of whether the lease rental payments were fair and reasonable. A careful review of all of the evidence leads to the conclusion that the decision of the Public Service Commission has a sound basis of evidentiary support.

Affirmed.

ROBERTSON, P. J., and NEAL, J., concur.