775 A.2d 1178

WASHINGTON SUBURBAN SANITARY COMMISSION,

v.

UTILITIES, INC. OF MARYLAND.

No. 116, Sept. Term, 2000.

Court of Appeals of Maryland.

June 21, 2001.

Reconsideration Denied Aug. 14, 2001.

2

**4**

Kurt J. Fischer (Paul A. Tiburzi and Marta D. Harting of Piper Marbury, Rudnick & Wolfe, LLP, Baltimore; Leonard L. McCants of McCants & Associates, LLC, Silver Springs; Ernest A. Crofoot and Robert H. Drummer of Washington Suburban Sanitary Commission, Laurel), all on brief, for petitioner/cross-respondent.

Steven P. Hollman (Jeffrey D. Pariser and Adam K. Levin of Hogan & Hartson, L.L.P., Washington; William E. Sundstrom of Rose, Sundstrom & Bentley, LLP, Tallahassee), all on brief, for respondent/cross-petitioner.

J. Joseph Curran, Jr., Attorney General of Maryland, Robert A. Zarnoch, Assistant Attorney General of Maryland, as Amicus Curiae for appellants.

Margaret Scott Izzo, Morgan, Lewis & Bockius LLP, Washington, DC, Amicus Curiae, National Association of Water Companies for appellee.

Thomas P. Gadsden, Morgan, Lewis & Bockius LLP, of Counsel, for Philadelphia, PA.

Argued before BELL, C.J. and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY, Judge, Retired, Specially Assigned.

Appellant and cross-appellee, Washington Suburban Sanitary Commission (WSSC), petitioned for the conventional con-

demnation of water and sewerage systems (the Systems) owned and operated by the appellee and cross-appellant, Utilities, Inc. of Maryland (UIM), a public service utility. The jury valued the Systems at $9.7 million from which, per statute, the court deducted $3.2 million representing contributions in aid of construction (CIAC).[1] UIM contends, *inter alia,* that the statute requiring the deduction of CIAC effects an unconstitutional taking without just compensation.[2] WSSC contends, *inter alia,* that the trial court erred in admitting evidence relating to the value of the Systems based on capitalization of the regulated cash flow at rates of return appropriate to an unregulated, governmental owner. As explained

---

1. *In re Kaanapali Water Corp.,* 5 Haw.App. 71, 678 P.2d 584 (1984), describes CIAC. They arise in the context of real estate development. The court quotes from an article by Alfred E. Kahn, a former chairman of the New York Public Service Commission, entitled, "Can An Economist Find Happiness Setting Public Utility Rates?" which appeared in Publ. Util. Fort., Jan. 5, 1980, at 11. *Kaanapali,* 678 P.2d at 591 n. 4. Discussing the evolution of the CIAC concept in rate-making, at least in New York, Mr. Kahn said:

 " '[T]he [utility] companies in question either are or were mere appendages of real estate developers, who got into the water business because most of their customers were unwilling to buy developed lots and houses without an attached water supply. Whatever they earned, they earned not on the water system as such, but on the combined operation....

 " 'The price that purchasers paid for the developed lots or houses must have reflected, explicitly or implicitly, the price that they were being charged for water and certain expectations about its future course. It seems a reasonable assumption that they had no reason to expect that rates would go up more than costs. If that assumption is correct, the inference is I think inescapable that to grant a water company associated with a real estate developer a rate increase by more than this would as a matter of economic fact involve permitting a double recovery of the original investment—once in the selling prices of the houses and, second time, by courtesy of the public service commission, in the price of the water.

 " '... [T]o the extent water suppliers had been content for some substantial period of time with rates that were "noncompensatory" by traditional criteria, that constituted prima facie evidence that some portion of the property dedicated to providing water had already been recovered in the sale prices of the lots and houses. This was a satisfying application of simple economic logic.' "

2. In an action separate from this condemnation proceeding, UIM had sought a declaratory judgment concerning the applicability or constitutionality of the statute requiring deduction of CIAC. In *Utilities, Inc. of Maryland v. WSSC,* 362 Md. 37, 763 A.2d 129 (2000), we held that a

8

below, we shall reverse on the appeal of UIM and affirm on the appeal of WSSC.

WSSC is a state agency, vested with broad authority to construct and operate water supply, sewerage, and storm water management systems in Prince George's and Montgomery Counties. *See* Maryland Code (1957, 1997 Repl.Vol., 2000 Cum.Supp.), Article 29, §§ 1–101 through 19–101; *Katz v. WSSC*, 284 Md. 503, 509, 397 A.2d 1027, 1031 (1979). UIM is a subsidiary of a nationwide holding company, Utilities Inc. (UI), that operates more than 350 utility systems in fifteen states. The Systems serve Marlboro Meadows, an unincorporated community of 1,200 residences in Prince George's County lying east of U.S. 301, approximately 1.6 miles northeast of Upper Marlboro. The Systems are capable of serving 1,800 residential units.

Major components of the condemned property include two wells collectively capable of producing three million gallons per day, a 500,000 gallon water tower, a 500,000 gallon ground source reservoir, auxiliary power sources, twenty-nine miles of pipe, seventy-five fire hydrants, 323 manholes, a waste water treatment plant, a waste water pumping station, a fresh water treatment plant, chemicals, inventory, spare parts, laboratory equipment, and office equipment. The utility also leases space on its water tower to three cellular telephone companies.

Marlboro Meadows was under development in 1965. The developer was Hylton Enterprises, Inc., a corporation owned by Cecil D. Hylton, Sr. (Hylton). Hylton also owned all of the stock of First Maryland Utilities, Inc. (First Maryland). In April 1965 the County Commissioners of Prince George's County granted First Maryland an exclusive franchise for the operation of water and sewerage treatment systems in Marlboro Meadows, and in July 1967 First Maryland received Public Service Commission of Maryland (PSC) authorization to exercise its franchise. It is undisputed that the PSC treated at least some substantial portion of the cost of construction by First Maryland of the initial water and sewerage treatment facilities at Marlboro Meadows as CIAC, made by

declaratory judgment action did not lie. By order of this Court, the briefs, appendices, and record extracts in the prior appeal have been made part of the record in the instant matter.

the initial purchasers of homes in that community as part of their purchase prices, and that the PSC deducted the CIAC from First Maryland's rate base.

By 1983 First Maryland had been sued by the Maryland Department of Health and Mental Hygiene for violations in sewerage treatment operations, and First Maryland had agreed to pay $200,000 in fines and plant improvements to settle that action. *Re First Maryland Utilities, Inc.*, 76 Md. P.S.C. 175, 177 (1985). The drinking water frequently contained "sand, iron and other particulate matter" and there were "instances of raw sewage backing up into . . . homes." *Id.* at 176–77. In March 1985 the PSC approved the transfer of the assets, rights, and franchises of First Maryland to UIM. *Id.* at 179. For purposes of the PSC's calculation of the rate base, UIM's purchase price was $200,000.[3] UIM promised the PSC that it would make substantial improvements to the Systems. At the time of trial of the instant matter UIM had made approximately $2 million of improvements to the Systems.

Despite the improvements made by UIM, homeowners in Marlboro Meadows continued to complain about the quality of the tap water. As a result the Prince George's County Council organized the Marlboro Meadows Policy Review Group. It consisted of representatives of the County Executive of Prince George's County, certain members of the Maryland Senate, House of Delegates, and Prince George's County Council, and representatives of WSSC and Marlboro Meadows. At times meetings of the group were attended by representatives of the Maryland Environmental Service (MES).[4] WSSC received funding in its capital improvement

---

3. The agreement between First Maryland and UIM also permitted Cecil D. Hylton, Sr. to obtain free hookups for 410 lots which he owned in Marlboro Meadows. *Re First Maryland Utilities, Inc.*, 76 Md. P.S.C. 175, 177 (1985).

4. The MES is

"an instrumentality of the State constituted as a body politic and corporate to provide water supply and waste purification and dispos-

programs for fiscal years 1994 and 1996 to study acquisition of the Systems. In September 1996 consultants engaged by WSSC reported that the tap water met current federal and state primary and secondary drinking water standards but that customer dissatisfaction with discoloration caused by the high iron content of the water continued. In November 1996 the review group recommended that WSSC acquire the Systems. By resolutions of July 30, 1997, and October 29, 1997, the Commissioners of WSSC authorized condemnation. The instant action was filed in the Circuit Court for Prince George's County on September 8, 1997.

At trial, the sole witness called by WSSC was John J. Boland, Ph.D. (Boland), a professor of applied economics at Johns Hopkins University. Boland opined that the fair market value of the Systems is $2,083,693, a figure which included valuing the leases to the cellular telephone companies at $461,180. Of the three basic approaches to value, comparable sales, capitalization of income, and reconstruction cost new less depreciation (RCNLD), Boland rested his ultimate opinion on his analysis of comparable sales.[5] Boland calculated

---

al services in compliance with State laws, regulations, and policies governing air, land, and water pollution to public and private instrumentalities, and with safeguards to protect the autonomy of the political subdivisions and the rights of the private entities it serves." Maryland Code (1973, 2000 Repl.Vol.), § 3–102(a) of the Natural Resources Article.

5. The comparable sales approach estimates market value by looking to recent voluntary sales transactions involving properties similar to the subject property, and adjusts for any differences between each comparable property sold and the subject property. 7A P.J. Rohan & M.A. Reskin, *Nichols on Eminent Domain* § 9A.04[1][c][i], at 9A–32 (3d ed. rev.2001). The income approach projects the net income that would be expected by the owner of the business and calculates the present value of the projected net income stream. *Id.* § 9A.04[1][c][iii], at 9A–35–36. The cost approach looks to the cost to build another identical facility, adds the value of the land, as zoned but unimproved, and subtracts depreciation and obsolescence. *Id.* § 9A.04[1][c][ii], at 9A–34. The cost approach is either "reproduction cost" or "replacement cost." The former "implies an identical replication of the existing structure with the same material and design." 8 P.J. Rohan & M.A. Reskin, *Nichols* § 14A.06[2][d], at 14A–21 (3d ed. rev.2001) (footnote omitted). " 'Replacement,' on the other hand, is a structure of similar or comparable

the value under the RCNLD method to be $7.2 million. In his income approach Boland capitalized the regulated income of UIM at rates which he considered appropriate for an investor owned buyer. He excluded rates appropriate to a willing acquisition by a governmental entity because he did not believe that there was a reasonable probability of a willing acquisition by a governmental entity, other than WSSC.[6] Comparing his valuation by the income approach with his valuation by the RCNLD method, Boland concluded that the disparity was due to "external obsolescence," namely, the regulation of the rates charged by UIM. Because of his view that the income approach placed a ceiling on what a buyer would pay, Boland excluded his $7.2 million calculation of RCNLD. Based on sales of privately owned utilities in Maryland which Boland considered to be comparable, he computed the value of the Systems under the comparable sales method at $1,622,513, to which he added the value of the tower leases, arriving at his ultimate opinion of value at $2,083,693.

Unlike WSSC's trial strategy, which sought to minimize or negate the weight of evidence of RCNLD value, UIM focused its case on attempting to persuade the jury to give maximum weight to a RCNLD value. UIM's first witness described the facilities and processes of the Systems. He testified that UIM

---

function and use employing the latest appropriate building materials and the most recent applicable engineering design." *Id.* We use the term, "reconstruction," in our abbreviated description of this method as a general term and to avoid making any distinction between "reproduction" cost and "replacement" cost. As the issues have been framed in the instant matter any distinction is irrelevant.

6. The value indicated by the capitalization of net income method is inversely proportional to the rate used. 8 *Nichols* § 14A.06[3][b], at 14A–26 presents the formula.

"Under the income approach, the value of the utility system is derived from use of the accounting formula V equals I/R, where I is net income; R is the capitalization or discount rate; and V is the value of the going concern."

(Footnote omitted). Thus, if the net income of the going concern is $100,000 per year its value is $1 million if the income is capitalized at ten per cent but the value is $2 million if the capitalization rate is five per cent.

invested between $1,750,000 and $2 million on capital improvements. UIM next called James Camaren, the CEO and board chairman of UI. He explained UI's business strategy of acquiring water and sewerage utilities from developers, making capital improvements to the utilities, and ultimately selling the utilities to municipal purchasers. He estimated the value of UIM, excluding the water tower leases, to be $3,000 for water service and $3,000 for sewerage service per actual and potential customer for a total of $10.78 million. UIM's third witness appraised the land without any improvements at $2,062,400.

A consultant who had been retained by WSSC to perform a RCNLD analysis which was rejected by WSSC testified that the value of the improvements under that method was $7.2 million. An expert, Gerald Hartman (Hartman), who had been retained by UIM to perform a RCNLD valuation of the Systems opined that the value was $9,233,036, exclusive of the land.

Next, UIM called John F. Guastella (Guastella), a consultant specializing in water and sewerage utility issues. In his opinion, based upon the RCNLD approach, the value of the tangible property as a going concern was $9,233,000 so that the fair market value of the Systems, including the land, was $11,295,000. Guastella's testimony included a discussion about a hypothetical government purchaser as part of the relevant market.

UIM's final witness was Robert F. Reilly (Reilly), an appraiser and author of works on appraisal whose experience is nationwide. Reilly expressed no opinion on value. He was retained by UIM to review and critique the appraisal performed by Boland, and to correct, if necessary, the latter's methodology and data sources. Reilly testified that it was impossible to correct Boland's methodology because the "major conceptual and practical errors" were too fundamental. Reilly criticized Boland for ignoring municipal purchasers, which Reilly said constitute ninety percent of the purchasers in the relevant market.

The court submitted the case to the jury on a verdict sheet in the following form:

"1. What amount of just compensation do you award to UIM?

"$_____

"UIM holds title to certain infrastructure that was contributed by developers in aid of constructing UIM's water and sewerage system. The amount of this contribution in aid of construction (CIAC) was $3.2 million.

"2. What amount of CIAC, if any, that you considered to have been an inducement for the purchase of lots or land to be served by the system did you include in your award of just compensation?

"$_____"

The jury verdict set just compensation at $9.7 million and found the amount of CIAC to be $3.2 million. The circuit court deducted the CIAC from the jury's valuation and ordered that "upon deposit by WSSC of $6.5 million into Court," the Systems "shall be held and become vested in WSSC."

Each party noted an appeal to the Court of Special Appeals. WSSC petitioned this Court for a writ of certiorari after the case was briefed in, but prior to oral argument before, the Court of Special Appeals. We granted the writ. *WSSC v. Utilities, Inc. of Maryland,* 362 Md. 189, 763 A.2d 736 (2000).

The issues that we address are:

I. Necessity of the taking;

II. The CIAC reduction of the award:

 A. Applicability of the statute to this case,

 B. Evidentiary sufficiency of applicability, and

 C. Constitutionality of the statute;

III. Admissibility of an unregulated income approach to valuation; and

IV. Miscellaneous evidentiary issues.

I

UIM presents a threshold issue, contending that WSSC's determination of necessity for the taking was legally erroneous. Article 29, § 3–106, conferring on WSSC the power to condemn existing water or sewerage systems, provided, prior to April 14, 1998, as follows:

"(a) *Acquisition.*—If the WSSC extends its general water supply or sewerage system to a municipally or privately owned water supply or sewerage system and the WSSC is ready to connect with the system, or if the WSSC considers such action to be expedient, advisable, and proper for the adequate operation of the system under the WSSC's jurisdiction, the WSSC may purchase the system.

"(b) *Purchase price; condemnation.*—If the WSSC and the owner fail to agree to the purchase price or conditions of purchase of the water or sewerage system, the WSSC may acquire the system by condemnation, as provided in Title 2 of this article." [7]

The circuit court granted partial summary judgment in favor of WSSC, finding that WSSC did not act arbitrarily or unreasonably in determining that a public necessity existed.

In a written opinion the circuit court described in detail the information considered by WSSC in its decision. WSSC planned to extend its water main 1,200 feet along Route 301, to connect to UIM's water system. Essentially WSSC rested its decision on the problems experienced by residents in Marlboro Meadows with discolored water and also on the concerns of those residents that they were paying significantly more for water and sewerage service than was being paid by homeowners serviced by WSSC. Efficient operation dictated

---

7. By Chapter 21 of the Acts of 1998, effective, as an emergency measure, April 14, 1998, the language "Title 2 of" was deleted from § 3–106(b). Title 2 of Article 29 is limited to quick take condemnation in Prince George's County. UIM rests no argument involving the necessity of the taking on the reference to Title 2 that appeared in § 3–106(b) prior to its amendment in April 1998. Chapter 21 of the Acts of 1998 also amended Article 29, § 3–107 giving rise to the argument discussed in Part II.A, *infra.*

acquiring UIM's sewerage system at the same time. UIM, in opposing summary judgment, pointed to evidence indicating that the taking was not "expedient, advisable, and proper for the adequate operation of the [Systems] under the WSSC's jurisdiction." The court concluded that "UIM's case boils down to its argument that WSSC will not likely meet its stated goals of improved water quality and lower rates." Although the circuit court agreed that it was uncertain whether "WSSC will actually achieve better water quality and lower rates," that court found "ample debatable evidence in the record to demonstrate a rational basis for" WSSC to condemn the property.

First, UIM contends that it was error to defer to WSSC's determination when ruling on a motion for summary judgment, saying:

> "The trial court misapplied the summary judgment standard in this case when it granted partial summary judgment to WSSC on the very basis that 'there is ample *debatable* evidence' regarding whether WSSC acted reasonably in making its necessity determination. . . . The court's reversible error results from its conflation of the procedural standards of summary judgment with the underlying substantive standard of judicial review of the decisions of a governmental agency. Rather than applying the summary judgment standard mandated by Maryland law, the court fabricated an admittedly 'unique' summary judgment standard, because the underlying necessity determination constituted an agency action. . . . But this is not the law, because the presence of 'debatable' evidence requires summary judgment to be *denied.*"

Brief of Appellee at 44–45. Second, UIM argues that it presented substantial evidence indicating that WSSC lacked a rational basis for its necessity determination. Third, UIM contends that WSSC acted arbitrarily by "violating its own rules and procedures." The first and second points may be considered together.

■ In order to defeat summary judgment, the disputed facts must be material. Maryland Rule 2–501. That there were conflicting facts before WSSC is immaterial. The issue before the circuit court was whether the decision ultimately reached by WSSC was supported by substantial evidence. So long as WSSC reached a conclusion that is fairly debatable the circuit court could not substitute its judgment for that of the governmental body on which the condemnation power had been conferred. *See Mann v. White Marsh Props., Inc.,* 321 Md. 111, 581 A.2d 819 (1990) (holding that, in specific performance action, conflicting inferences from undisputed facts do not defeat alleged vendor's statute of frauds defense, raised by summary judgment, because part performance avoidance of statute of frauds is not available where inferences are conflicting).

■ The judiciary has a very limited role in reviewing an agency's decision that there is a need for particular property. *County Comm'rs of Frederick County v. Schrodel,* 320 Md. 202, 216, 577 A.2d 39, 46 (1990). The following passage from *Murphy v. State Roads Comm'n,* 159 Md. 7, 15, 149 A. 566, 570 (1930), succinctly summarizes that limited role:

"Ordinarily the question of whether a proposed [location] is required by public necessity is legislative rather than judicial. . . . [T]he decision . . . as to the public necessity for taking particular property is not subject to judicial review unless [the] decision *is so oppressive, arbitrary or unreasonable as to suggest bad faith.*"

(Emphasis added). In *WSSC v. Santorios,* 234 Md. 342, 346, 199 A.2d 206, 208 (1964), we quoted with approval the following passage from what is now 1A J.L. Sackman, *Nichols on Eminent Domain* § 4.11[3], at 4–215 through 4–218 (3d ed. rev.2000) (footnotes omitted):

" 'The necessity is for the condemnor and not for the courts to decide, and the decision of such condemnor is final so long as it acts reasonably and in good faith. If the land is of some use to it in carrying out its public object, the degree of necessity is its own affair. Whether there is any necessity

whatever to justify the taking is, however, a judicial question.' "

The most recent pronouncement by this Court was made in *Green v. High Ridge Ass'n*, 346 Md. 65, 79, 695 A.2d 125, 132 (1997), *cert. denied*, 522 U.S. 1047, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998), where we explained:

"This Court has held, however, that the question of whether there is a 'necessity' for a particular condemnation is primarily for the legislative and/or executive branches of government. . . .

"The determination by a condemning authority that a particular taking is 'necessary' will not be set aside by the courts unless the condemnor's decision 'is so oppressive, arbitrary or unreasonable as to suggest bad faith,' *Anne Arundel County v. Burnopp*, 300 Md. [343,] 349, 478 A.2d [315,] 318 [ (1984) ]."

 In support of its assertion that there was a lack of substantial evidence to support WSSC's decision, UIM argues that there was no evidence that WSSC would be able to achieve its stated goals of improving water quality and stabilizing or reducing costs to consumers. No such finding is required by the law, and the absence of proof that WSSC could achieve its goals certainly does not render its findings arbitrary or unreasonable. In *Schrodel, supra*, this Court, relying upon the United States Supreme Court's decision in *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), rejected the argument that Frederick County's decision to condemn certain property in order to build a landfill was oppressive, arbitrary, and unreasonable because there existed a possibility that the County might fail to obtain the necessary permits and be unable to use the land as a landfill. We said:

" 'Of course, this Act, like any other, may not be successful in achieving its intended goals. But "whether *in fact* the provision will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if . . . the . . . [state] Legislature *rationally could have believed* that the

[Act] would promote its objective." *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 671–672, 101 S.Ct. 2070, 2084, 68 L.Ed.2d 514[, 532–33] (1981);'

\*　　\*　　\*　　\*　　\*　　\*

" 'When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings—no less than debates over the wisdom of other kinds of socioeconomic legislation—are not to be carried out in the federal courts.' "

*Schroedel*, 320 Md. at 217, 577 A.2d at 47 (quoting *Midkiff*, 467 U.S. at 242–43, 104 S.Ct. at 2330, 81 L.Ed.2d at 198–99). That WSSC may ultimately fail to improve water quality or control the costs to consumers does not render its decision arbitrary and unreasonable.

■ Finally, UIM asserts that WSSC acted "arbitrarily and capriciously by violating its own policies and procedures." In support UIM refers to a consultant's memorandum of a meeting and to deposition testimony of WSSC's General Manager, describing how WSSC proceeded in certain matters in the past. UIM fails to point to any violation of statutes or rules. There is simply no basis for invalidating WSSC's decision for purported procedural irregularities.

For these reasons, the circuit court did not err in granting summary judgment in favor of WSSC on the issue of public necessity.

## II

The special verdict form in this case was designed to comply with Maryland Code (1957, 1997 Repl.Vol., 2000 Cum.Supp.), Article 29, § 3–107 which, as of April 14, 1998, provides:

"(a) *Jury award in condemnation proceeding.*—If a privately owned water or sewerage system is the subject of a condemnation proceeding under this article, a jury in the proceeding shall:

"(1) Consider as part of an award any payment, contribution, or tax paid by the respective lot owners or purchasers toward the construction of the system; and

"(2) If the system has been built in connection with and for the purpose of developing home sites, subdivisions, or villages by any person and the system has been offered as an inducement for the purchase of lots or land to be served by the system, deduct from the determined value of the plant or system a sum that the jury reasonably determines was added to the purchase price of the land or lots for the purpose of constructing the system."

■ The figure of $3.2 million representing CIAC that appeared in the verdict sheet as furnished by the circuit court to the jury was derived from reports filed by UIM with the PSC. For purposes of rate-making a public utility is not permitted to include CIAC in its rate base on which the charges to the utility's customers are based. *See City of Hagerstown v. Public Serv. Comm'n*, 217 Md. 101, 141 A.2d 699 (1958). It appears that the $3.2 million figure for CIAC represents the original cost of building the Systems, presumably less the original cost of property no longer in use, plus any contributions to UIM of property added to the Systems after UIM's acquisition.

UIM asserts that current § 3–107 is not applicable to this condemnation because on September 8, 1997, when WSSC petitioned for conventional condemnation, the text of the statute expressly limited its application to "quick take" condemnation by WSSC in Prince George's County. Further, UIM asserts that the evidence is legally insufficient to establish that the Systems were "offered as an inducement for the purchase of lots" or that "a payment" was made by the lot "purchasers toward the construction of the [S]ystems." Ultimately, UIM contends that § 3–107 effects an unconstitutional taking.

A

Since WSSC's creation by Chapter 122 of the Acts of 1918 and until Chapter 767 of the Acts of 1982, the statutes

governing condemnation by WSSC of water and sewerage utilities provided for deducting CIAC from fair market value. *See* Chapter 122, Acts of 1918, at 260; Code of Public Local Laws of Montgomery County, § 1196, at 671–72 (1939); Code of Public Local Laws of Prince George's County, § 1446, at 831–32 (1943); Chapter 53, Acts of 1967, at 64–67 (conferring the "quick take" power on WSSC for takings in Prince George's County); and Chapter 805, Acts of 1981, at 3078 (transferring statutes relating to WSSC from public local to public general laws).

After the 1981 transfer from public local to public general laws, the CIAC provision was codified as Maryland Code (1957, 1978 Repl.Vol., 1981 Cum.Supp.), Article 67, § 3–6. In 1982, then Article 67, § 3–6 was recodified as Article 29, § 3–107. In that recodification the phrase "under Title 2" was added preceding "of this article" in House Bill 1802, enacted as Chapter 767 of the Acts of 1982. Title 2 of Article 29 deals only with quick take in Prince George's County. "[U]nder Title 2" was deleted by emergency legislation, Chapter 21 of the Acts of 1998, effective after this petition for condemnation was filed.

WSSC submits that the 1982 change was a mistake. The 1982 legislation was the product of the "WSSC Code Revision Committee" (the Committee), formed in 1981 and consisting of certain legislators from Montgomery and Prince George's Counties. Its chair, in a June 4, 1981 letter, explained that the Committee's work would be "to accomplish desired structural, stylistic and technical changes and clarification of language where necessary." He further explained:

"It should be noted here that substantive changes are *not* a part of this process but, rather, the Committee is charged with performing in a manner similar to that of the Code Revision Commission in its handling of Articles of the Annotated Code of Maryland."

A December 21, 1981 letter from another member of the Committee stated that a public hearing on the bill was unnecessary because it involved "strictly Code revision and stylistic"

changes. A written statement, dated November 16, 1981, prepared by a staff attorney for briefing the Montgomery County Delegation, confirmed that the purpose of the bill was to modernize and clarify the WSSC law, not to make substantive policy changes. The statement also indicates that the vehicle for substantive changes would be a companion bill, eventually enacted as Chapter 768 of the Acts of 1982. Finally, the minutes of the February 25, 1982 House of Delegates Bi–County Committee meeting, at which House Bill 1802 was given a favorable report, referred to it as a "stylistic revision."

WSSC argues that the plain language of § 3–107, as it read from 1982 to 1998, effected no substantive change because the language change was made during the course of Code revision, is an obvious mistake, and there is an absence of the clearest legislative intent to make a substantive change. WSSC cites *Rettig v. State*, 334 Md. 419, 426–27, 639 A.2d 670, 674 (1994); *McGarvey v. State*, 311 Md. 233, 242, 533 A.2d 690, 694 (1987); and *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 508–09, 525 A.2d 628, 629–30 (1987). WSSC also argues that applying the plain language of the 1982–1998 version would defy the clear legislative purpose which the plain language test seeks to discern and would lead to a result that is " 'unreasonable, illogical, [and] inconsistent with common sense.' " *Kaczorowski*, 309 Md. at 516, 525 A.2d at 633 (quoting *Potter v. Bethesda Fire Dep't*, 309 Md. 347, 353, 524 A.2d 61, 64 (1987)).

We do not accept the premise of UIM's argument that the applicability of present § 3–107(a) is determined by the date of institution of the instant action. Maryland Code (1974, 1996 Repl.Vol., 2000 Cum.Supp.), Title 12 of the Real Property Article (RP) and Title 12, Chapter 200 of the Maryland Rules govern "[a]ll proceedings for the acquisition of private property for public use by condemnation." RP § 12–101. Where, as here, the condemnation is not effected by a quick take procedure title is deemed to be taken "if the plaintiff pays the judgment and costs pursuant to Title 12, Chapter 200 of the Maryland Rules." RP § 12–102(2). RP § 12–103 then provides:

"Unless an applicable statute specifies a different time as of which the value is to be determined, the value of the property sought to be condemned ... shall be determined as of the date of the taking, if taking has occurred, or as of the date of trial, if taking has not occurred."

■ The language of Article 29, § 3–107 dictates that, in determining value, CIAC is to be deducted from the fair market value of the property taken. The language of § 3–107 states a special rule of valuation for condemned, privately owned water and sewerage systems in the Washington Suburban Sanitary District. Under RP § 12–103 the critical date for determining value in a conventional condemnation is the date of trial. In the instant matter trial commenced January 24, 2000, well after amended Article 29, § 3–107 became effective. Therefore, amended § 3–107 applies in the instant matter.

## B

■ The evidence was sufficient for the jury to find that the Systems "had been offered as an inducement for the purchase of lots or land" and that the respective lot owners paid an amount toward construction of the Systems. UIM's Annual Reports to the PSC for the years 1996, 1997, and 1998 were received into evidence and showed the amount of CIAC to be $3,190,000, $3,209,000, and $3,171,000, respectively. The jury was entitled to infer that the Systems had been offered as an inducement for purchase and that the lot owners indirectly paid toward the original construction of the Systems. *See Hagerstown*, 217 Md. at 108–09, 141 A.2d at 702 ("[W]e have no doubt that any such costs originally paid by the developers were passed on to the purchasers in the form of increased prices for lots. . . ."); *In re Kaanapali Water Corp.*, 678 P.2d at 590–91 (holding in rate case that there was a rebuttable factual presumption that privately owned water utility had received CIAC from developer of hotel-resort complex); *Princess Anne Utilities Corp. v. Commonwealth ex rel. State Corp. Comm'n*, 211 Va. 620, 179 S.E.2d 714, 717 (1971) (hold-

ing in rate case involving privately owned utility that "it would be wholly unrealistic to say that the costs of the sewerage facilities contributed by the land development companies were not passed on to those customers").

As a corollary to the argument now under consideration, UIM submits that the circuit court erred in structuring the verdict sheet by stating, without qualification, that the amount of CIAC was $3.2 million. If this argument were successful, the result would be a new trial at which the $38,000 swing between $3.209 million and $3.171 million would be at issue. Deciding that issue at a new trial would still leave unresolved the constitutionality of Article 29, § 3–107 which we were unable to reach in *Utilities, Inc. of Maryland v. WSSC,* 362 Md. 37, 763 A.2d 129 (2000), and which was a substantial factor in the grant of by-pass certiorari in the instant matter. Reaching the constitutional issue is unavoidable in this case.

## C

The Supreme Court of the United States "has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking contemporaneously paid in money.' " *United States v. 50 Acres of Land,* 469 U.S. 24, 29, 105 S.Ct. 451, 454, 83 L.Ed.2d 376, 382 (1984) (internal attribution omitted). *Accord Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1, 10 (1984); *United States v. 564.54 Acres of Land,* 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435, 440–41 (1979); *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236, 1244 (1934); *United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 81, 33 S.Ct. 667, 679, 57 L.Ed. 1063, 1082 (1913). UIM contends that § 3–107(a) operates to take its property without just compensation in that step one of the procedure under § 3–107(a) requires a determination of fair market value of the going concern, including CIAC, but, in step two, the statute directs that the fair market value of the property be reduced by CIAC.

CIAC, as part of the Systems, is not specifically identifiable property. It is a running tally maintained for PSC reporting purposes dating back to the original construction of the Systems by First Maryland. UIM holds title to the Systems, UIM pays taxes on the Systems, and UIM is responsible for maintenance of the Systems. UIM concludes that the Systems are its property. WSSC basically makes two interrelated arguments in support of the statute's constitutionality. The condemnor says that UIM has no reasonable, investment-backed expectation to payment for CIAC. In support WSSC cites *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (sustaining the constitutionality of an ordinance preserving historic buildings which was in effect when the condemnee purchased an historic building and which prevented the condemnee from increasing the height of the building). In that context the Court said that "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations." *Id.* at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. WSSC also points out that whether a condemnee has a property interest in the subject of the condemnation is a matter that is determined by state law, see *Phillips v. Washington Legal Found.,* 524 U.S. 156, 164, 118 S.Ct. 1925, 1930, 141 L.Ed.2d 174, 183 (1998) (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972)), and argues that, under Maryland law, UIM has only a bare legal and non-beneficial title in the CIAC. Both of WSSC's arguments rest on *Hagerstown,* 217 Md. 101, 141 A.2d 699, reinforced by the presumption that enactments of the General Assembly are constitutional. *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 218, 334 A.2d 514, 520 (1975).

The City of Hagerstown had extended its municipal water system beyond the municipal limits, thereby bringing the extension under PSC jurisdiction. The extension incorporated mains and hydrants which had been built by developers of real estate subdivisions who contributed their privately owned

systems to Hagerstown. *Hagerstown,* 217 Md. at 108, 141 A.2d at 702. Pursuant to a predecessor statute to present Maryland Code (1998), § 4–305 of the Public Utility Companies Article, Washington County had caused the PSC to set the rates in the extra-municipal area for water furnished by Hagerstown. The City petitioned for review of the PSC order, contending that, by excluding CIAC from the rate base, the PSC had violated the mandate of Maryland Code (1957), Article 78, § 69 that rates be " '[j]ust and reasonable' . . . yielding . . . a reasonable return upon the fair value of the company's property used and useful in rendering service to the public." *Hagerstown,* 217 Md. at 108, 141 A.2d at 702. The PSC argued "that the customers of a public service company should not be called upon to pay rates which would yield a return to the company on property for which they or others, but not the public service company, ha[d] paid." *Id.* This Court sustained the PSC's exclusion of CIAC from the rate base, reasoning as follows:

> "The rationale of the Commission's exclusion from the rate base of [CIAC] in the instant case and in [a prior PSC case] decided shortly before the present case, and the rationale of the many decisions of Commissions of other States reaching a like result is, in essence, that it is inequitable to require consumers to pay to the utility a return on property which they, not the utility, have paid for."

*Id.* at 112, 141 A.2d at 704.

The Court in *Hagerstown* advanced two additional theoretical reasons for the exclusion from the rate base, progressing from a contractual theory to a trust theory. It is the following passage from *Hagerstown* on which WSSC relies:

> "Such a result may be supported, not only as a matter of rather obvious fairness, but also as a matter of perhaps somewhat technical theory, in spite of the fact that the utility holds legal title to the contributed property, on the ground that the contributed property is subject to contractual rights in favor of those who furnished it (treating a developer as if he were the agent of those who buy lots served by the contributed facilities), which place the benefi-

cial use of the property in those who, from time to time, own the lots, houses, factories or lands which the water company (in this case the City) has agreed to serve, so that the value of the water company's bare legal title to the property is nothing. In other words, the water company (here the City) is simply in the position of a trustee, holding legal title to the contributed property for the benefit of those with whom it has contracted, or their successors in interest."

*Id.* at 112, 141 A.2d at 704–05.

The terms of the contract between the developer, as agent for homeowners in the development, and the water company, owned by the developer, are not articulated in *Hagerstown.* We infer that, in consideration of the payment to the developer-controlled water company by the homeowners, acting through the developer as their agent, of some portion of their purchase prices, the water company agreed that it would not utilize an amount equal to the contributions in computing the fair value of the company's property, used in rendering the water service, on which a reasonable return would otherwise be allowed. Thus, for rate-making purposes, the value of the CIAC is nothing. The Court in *Hagerstown* then explained the practical result of the contract theory by an analogy ("[i]n other words") to a trust. We shall hold (see Part II.C.2, *infra*) that the trust theory cannot be transported from rate-making into eminent domain.

1

WSSC begs the question when it argues that the mere presence of § 3–107(a) on the statute books at the time that UIM purchased the Systems from First Maryland means that UIM had no reasonable investment-backed expectation that it could value the CIAC in condemnation. The argument assumes the constitutionality of § 3–107(a). Less superficially, WSSC's argument is that, because CIAC is excluded from the rate base, UIM could have no expectation of any return on that portion of the investment in the Systems represented by CIAC so that the Systems should be considered valueless in eminent domain to the extent of the CIAC. This argument is

practically indistinguishable from an argument that the fair market value in condemnation of utility-owned property that has been acquired in part by CIAC is capped by the valuation determined by a capitalization of the regulated income. That cannot be correct.

Considerable doubt on the validity of the underpinnings of WSSC's argument is cast by 2 L. Orgel, *Valuation Under the Law of Eminent Domain* § 204 (2d ed.1953). Discussing "Condemnation Value versus Rate–Making Value," the author states:

> "The distinction between rate-making value and condemnation value on the ground that the latter was based on exchange value while the former was measured by cost could be accepted only with reservations as to what it implied in actual valuation practice. In the first place, the tribunals in condemnation cases, as in rate cases, paid scant attention to the market value of outstanding securities. In the second place, the inference that capitalization of earnings would be accepted in condemnation cases but excluded in rate cases was unjustified. It is true that courts and commissions had come generally to recognize that the capitalization of earnings as a basis of rate making would involve a vicious circle and that earning power could be given weight in condemnation cases without falling into this fallacy.[8] But as we shall point out in a subsequent section, while earnings were considered, capitalization of earnings was uniformly rejected as the measure of value in condemnation cases."

*Id.* at 71 (footnote omitted).

4A J.L. Sackman, *Nichols* (3d ed. rev.2000), presents the following summary of the elements to be considered when a public utility, as a going concern, is taken in condemnation.

> "When the plant of a public service corporation is taken by eminent domain, the corporation is not limited to the

---

**8.** If fair value is determined by the regulated rates and the regulated rates are to be set to realize a reasonable return on fair value, the process resembles a "Catch 22" proposition.

value of its physical property, or to the cost of reproducing the same, but it is entitled to be paid for the value of its property and franchises taken together as a going concern and as parts of one working system. In reaching that value there are a number of tests, no one of which is conclusive, but each of which sheds some light upon the subject of the investigation. The elements ordinarily considered in ascertaining the value of the utility are the current value of the tangible property of the company, the earnings, both present and future, of the company, the 'going value' of the plant, and the amount of money required to put the plant in good condition."

*Id.* § 15.07, at 15–48 to 15–49 (footnotes omitted). *See also Onondaga County Water Auth. v. New York Water Serv. Corp.,* 285 A.D. 655, 139 N.Y.S.2d 755, 762 (1955) (no one method of valuation in condemnation of private water company is determinative).

4A *Nichols* also points out another distinction between valuation of a utility in rate-making cases and in condemnation cases. The commentator states that "when determining value in condemnation matters, greater weight seems to have been placed upon the factor of cost of reproduction, while in the rate-making cases, original cost is given predominant consideration." *Id.* § 15.06[2], at 15–47 (footnote omitted).

Justifying § 3–107(a) on the ground that the investment return value of the Systems establishes a ceiling excludes from the valuation in eminent domain not only CIAC but also utility property that is recognized in a fair market at values that are higher than those recognized in rate-making. In 8 P. Rohan & M. Reskin, *Nichols* (3d ed. rev.2001), the authors give the following explanation:

"Even though such physical additions [*i.e.,* CIAC] to the plant are typically deeded over to the utility, and add value to the plant, they are not added to the rate base and thus do not generate additional rate charges. The modern theory of rate setting requires not 'market' or 'fair' value, but rather, a 'fair return to the investors.' As such, contributions from

customers are not direct investments of the utility owner, and are therefore excluded from rate base.

"Note here that the property excluded from rate base (but which must be included in fair value) may be significant: fully depreciated machinery still functioning and useful; valuable assets, which have been depreciated on the books, but which may have appreciated in market value; and large amounts of contributed infrastructure owned and used by the utility owner, but not included in rate base. The importance of this point is that a utility valuation by whatever approach, premised on a regulatory rate base that excludes significant utility assets, almost without exception results in less than full or just compensation for all property taken."

*Id.* § 14A.06[1][6], at 14A–17 (footnotes omitted).

In the instant matter land utilized by the Systems was acquired by First Maryland from Hylton Enterprises, Inc. in 1965 and was carried in PSC reports as part of the CIAC. We take judicial notice that land values in the vicinity of Upper Marlboro have appreciated since 1965. The area has become a "bedroom" for Washington, D.C. Indeed, the record reflects that most of the residents of Marlboro Meadows are employed by the federal government. Although the income approach to value undertakes to value the entire enterprise, including the land, a valuation based upon the regulated income which is derived from a rate base that does not include appreciation excludes a significant aspect of the fair market value of the Systems.

For these reasons § 3–107(a)'s requirement that CIAC be deducted from the fair market value of the Systems, valued as going concerns, cannot escape the constitutional prohibition against a taking without just compensation on the ground that UIM had no reasonable investment-backed expectation in the Systems. It is value, not expectation of value, that applies in eminent domain and other actual takings.

2

WSSC also contends that there has been no taking of property because the interest held by UIM in the Systems is not property; rather, it is said to be the bare legal title of a trustee, with the beneficial interest in the owners of homes in Marlboro Meadows, from time to time. Section 3–107(a) cannot have created this result, because § 3–107(a) operates only within Montgomery and Prince George's Counties and in favor of WSSC. If the private owners of utilities outside of Montgomery and Prince George's Counties would not suffer a deduction from fair value in condemnation for CIAC, then § 3–107(a) deprives UIM of equal protection of the laws and is invalid on that ground. Consequently, WSSC's position must be that *Hagerstown* is not limited to rate-making but states a rule of the Maryland law of property, *i.e.,* § 3–107(a) simply declares what already was, and is, Maryland property law.

As noted above, the actual holding in *Hagerstown* is that CIAC may not be included in the rate base. That conclusion is fully supported by the rationale first assigned, essentially, that it is inequitable for the approved rate to include a return on an investment made, in an economic sense, by the home-owners and not by the public utility. The next level of the *Hagerstown* rationale is an implied contract. Under that analysis, the terms of the contract result in CIAC having no value to the utility for rate-making purposes. But it would extend the contract rationale beyond what was required to decide the issue before the Court in *Hagerstown* to read into the statement of no value that the CIAC had no value in eminent domain. Such an extension would also needlessly have injected the *Hagerstown* Court into deciding a constitutional issue. The same may be said of the third level of the *Hagerstown* analysis, analogizing to a trust.

 We have neither been referred to, nor has our research disclosed, any reported decision involving the condemnation of the entire business of a public utility company in which a court held that CIAC was trust property, not beneficially owned by the utility, and consequently unprotected by the constitutional

requirement for just compensation when property is taken. The cases that have cited and applied *Hagerstown* have been rate cases. In *North Carolina ex rel. Utilities Comm'n v. Heater Utilities, Inc.,* 288 N.C. 457, 219 S.E.2d 56, 59–60 (1975), the court utilized the *Hagerstown* trust analysis in rejecting a utility's argument that CIAC could not constitutionally be excluded from the rate base. The utility's argument was based upon *Board of Comm'rs v. New York Tel. Co.,* 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926), where the Court held that it was unconstitutional to exclude from the rate base property acquired through the expenditure of excessive earnings. The North Carolina court viewed excessive earnings as "clearly belong[ing] to the utility with no strings attached," 219 S.E.2d at 60, but pointed out that such earnings

> "are not supplied by the utility patrons pursuant to any contract, express or implied, for the extension of the utility's service. Property acquired by the use of such funds, therefore, is not analogous to property affected by a trust for the benefit of the patrons from whom the excess profits were derived, nor is it analogous to property acquired by an outright, unrestricted gift."

*Id.* Accordingly, the North Carolina court held that the United States Constitution did not prevent CIAC from being excluded from the rate base. Indeed, the primary holding of *Heater Utilities* is that the North Carolina rate-making statute did not, as a matter of legislative intent, include CIAC in ascertaining the fair value of the utilities property for rate-making.

The few cases that have considered CIAC in an eminent domain context have held, or strongly indicated, that CIAC must be fairly compensated. In *Dade County v. General Waterworks Corp.,* 267 So.2d 633 (Fla.1972), Dade County had condemned the defendant's water and sewerage system. The trial court had construed Dade County's complaint to limit valuation to "capitalization of regulated earnings as the sole acceptable approach to evaluation." *Id.* at 639. The Supreme Court of Florida held that the " 'full compensation' standard [of the Florida constitution] requires that the method of valuation which is utilized take into consideration the value of

the contributed property." *Id.* Adopting portions of the trial court's opinion, the Florida Supreme Court said:

> " 'The so-called contributed property owned by defendants, and which the County seeks to acquire by condemnation, constitutes property within the meaning of Article X, Section 6(a), Florida Constitution. . . .
>
> . . . .
>
> " 'The manner in which defendants came to own this property does not operate to exclude it from the otherwise applicable constitutional requirements.' "

*Id.* at 639–40.

Although the trial court in the *Dade County* case had based its ruling solely on the complaint, that court had gone so far as to hold that the utilities were to be valued by the RCNLD method. *Id.* at 639. In language particularly appropriate to WSSC's argument in the instant matter, the Florida Supreme Court said:

> "Since regulated earnings place no value on contributed property, it follows that capitalization of *regulated* earnings is unacceptable as a method of valuing appellees' property in this proceeding. It does not follow that capitalization of earnings generally, provided the private corporation is profitable, should be excluded as a method of valuation, and we do not so exclude it. If, however, in practice, the method should prove too speculative, or if it becomes apparent that it fails to consider some elements of the value of appellees' property, the trial judge will have the prerogative of excluding it at trial."

*Id.* at 641. To the same effect, *see General Dev. Utilities, Inc. v. Charlotte County,* 620 So.2d 1035 (Fla.Dist.Ct.App.1993).

In rate-making cases, Florida follows the general rule and excludes CIAC from the rate base. *See Florida Cities Water Co. v. Board of County Comm'rs,* 334 So.2d 622 (Fla.Dist.Ct. App.1976); *Re Peoples Gas Sys., East Coast Div.,* 45 P.U.R.3d 449 (Fla. R.R. & Pub. Utilities Comm'n 1962).

The Supreme Judicial Court of Maine similarly held that compensation for the taking in condemnation of contributed property is constitutionally required. In *Rangeley Water Co. v. Rangeley Water Dist.*, 691 A.2d 171 (Me.1997), the water district was acquiring by eminent domain the system of an investor owned water company. Part of the system included a 1,200 foot distribution main that had been paid for by the developer of a three building condominium complex and contributed to the water company. The water district appealed from a judgment that included the CIAC in the valuation, arguing that the water company did not pay for construction of the line and was being overcompensated. In response the court said:

"In a rate proceeding, contributed property is not included in a utility's rate base because it would be unfair to allow the utility's investors to recoup from ratepayers money that the utility did not expend.... The P.U.C. will not permit utilities to recover from ratepayers the depreciation of contributed property because the utility 'did not make the original investment in the contributed property, [and] it has nothing to recover through depreciation.' *Maine Water Co. v. P.U.C.*, 388 A.2d 493, 495 (Me.1978).

"The condemnation of utility property, however, involves different considerations. Valuation of the utility's condemned property must ensure that 'as the end result of the exercise of the power of eminent domain, the owner will be receiving the equivalent monetary worth for the value of the property taken from the time of taking.' *Orono–Veazie Water District v. Penobscot County Water Co.*, 348 A.2d 249, 255 (Me.1975). The Rangeley Water Company is entitled to 'just compensation for the taking of [its] property by the process of eminent domain.' *Curtis v. Maine State Highway Comm'n*, 160 Me. 262, 265, 203 A.2d 451, 453 (1964). 'Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service.' *Board of Public Utility Commissioners v. New York Tel. Co.*, 271 U.S. 23, 31, 46 S.Ct. 363, 366, 70 L.Ed. 808[, 812]

(1926). The original source of the funds for construction of the Lakehause line does not prevent the inclusion of the line in the valuation of the Water Company when the line was Water Company property under the law. 'The complete dissimilarity between rate-making concepts and the just or full compensation standards which govern eminent domain have resulted in rejection of attempts to equate rate-making with eminent domain as a basis for determining fair market value.' *Dade County v. General Waterworks Corp.*, 267 So.2d 633, 640 (Fla.1972) (citation omitted). The Water Company owned the line and used it in the provision of water service, thus entitling the company to compensation for the line when it was condemned."

*Id.* at 178.

The issue before us is approached from the standpoint of the contributors in *Reinhold v. Fee Fee Trunk Sewer, Inc.*, 664 S.W.2d 599 (Mo.Ct.App.1984). There the local sewer district, a municipal corporation, acquired by negotiation the entire business of a privately owned sewerage company, including CIAC in excess of $1 million. Consumer plaintiffs alleged that the amount of CIAC should be paid to them and to members of the class which the plaintiffs sought to represent. Asserting a principle of " 'bilateral fairness,' " the plaintiffs relied on Missouri decisions holding that CIAC could not be included in determining the rate base for rate-making purposes. *Id.* at 603. In response the court said:

"These cases do not help the plaintiffs. Both are authority only for the proposition that a utility may not have these contributed assets considered toward justifying a *rate* increase to customers. The courts hold to do so would result in two inherent inequities: first, to allow the utilities to include these 'contributions' in the rate base is to ask the utility customers to pay twice for the same thing; second, it allows the utility's shareholders to receive a return on money which they never invested.

"The plaintiffs cite no authority for the proposition that they are entitled to share in the proceeds received from the

*sale* of '[CIAC]' where the purchasing company continues service to the property owners.

"Even more damaging to the plaintiffs' position is their failure to plead any facts that show them to have any right, title or *property* interest in these amounts for which they claim they should be paid. They say in their petition that Fee Fee 'received legal title to assets as [CIAC].' Their own petition limits them to claiming an equitable interest in these contributions, but they present no facts that would give rise to their ever getting legal title. As our Supreme Court has noted, an equitable title is the right in the party to whom such title belongs to have the legal title transferred to him upon the performance of a specified condition.

"In order to have a right to the proceeds from the sale of the '[CIAC],' the ratepayers would have to show that legal title in such 'contributions' would revert to them upon the occurrence of some specified condition. A sale of Fee Fee to M.S.D. as supplying the occurrence of this necessary condition has no roots in any contract or document."

*Id.* (citations omitted).

The court in *Onondaga County Water Auth. v. New York Water Serv. Corp., supra,* 285 A.D. 655, 139 N.Y.S.2d 755, a condemnation case, considered an argument that, by statute, the rate of return used in a condemned utility's rate structure was the only rate that could be used for the capitalization of income approach in a condemnation valuation. 139 N.Y.S.2d at 768. The court pointed out that "[i]f the certified rate of return *must* be accepted as the capitalization rate, the legislature would, in effect, be fixing original cost as the measure of value for condemnation." *Id.* There is, however, a "complete lack of similarity between the original cost used in rate-making and the 'just compensation' for the purpose of taking[.]" *Id.* Holding that the statute required no more than that due regard be given to the certified earnings, the court said that interpreting the statute to fix "the rate base as a measure of 'just compensation' would at the least be contrary to the legislative intent and at the most unconstitutional." *Id.*

That portion of the reasoning in *Hagerstown* that relied on unfairness to ratepayers was applied in *City of South Bend v. Users of the Sewage Disposal Facilities of Clay Utilities*, 402 N.E.2d 1267 (Ind.Ct.App.1980), in what might be described as a first cousin to a rate case. An Indiana statute authorized municipalities to enter into lease-purchase agreements for the acquisition of water systems outside of the municipal limits, and South Bend had agreed in a negotiated transaction to buy a private system for $1.9 million, payable in annual lease payments of just under $163,000. Under the statute authorizing that form of acquisition the lease payments were required to be made exclusively from revenues obtained from rates charged users of the acquired system. The Indiana Public Service Commission withheld approval of the transaction on the ground that the lease payments were not fair and reasonable to the ratepayers. *Id.* at 1269.

In the reported case the court affirmed that agency's action and rejected on three grounds the city's argument that the total lease payments represented the fair market value of the property. First, the city was not a "typical willing purchaser," *id.* at 1274, because it "can make whatever charges are necessitated by the lease purchase agreements and conveniently can assess the value from a viewpoint which is significantly different from that of the private investor." *Id.* at 1273. Second, the rate base of the selling private utility included $1.2 million of CIAC which would carry over into the rate base of a private purchaser, causing the court to question whether a private purchaser would pay $1.9 million under those circumstances. *Id.* at 1272–73. Third, the court, citing *Hagerstown*, considered it inequitable to require the users to pay for the property twice, once in the CIAC and again in the recovery of the negotiated acquisition price. *Id.* at 1275.

■ The transaction in *City of South Bend* was not a taking by condemnation. Indeed, the court acknowledged that its "brief consideration of condemnation principles constitutes *obiter dictum* in this opinion." *Id.* The case affirms the agency's withholding of approval of the transaction partly because it was "repugnant to the users who must pay the

negotiated price." *Id.* The agency had not fixed a price, and the court did not hold that CIAC must be totally excluded from a negotiated price intended to represent fair market value.[9]

The fundamental reason why *Hagerstown* cannot be read as stating a rule of Maryland property law is that it is inconsistent with the law of trusts. When does the trust arise? What kind of trust is created?

The CIAC concept presupposes a developer who offers for sale lots that are served by water and sewerage systems, either for building or with a building erected upon it. In the development process the developer ordinarily holds legal title to the land out of which lots will be subdivided and on part of which treatment facilities, pumping stations, and mains will be established. Ordinarily the land will be subject to liens securing repayment of money borrowed for construction. At some

---

**9.** The Maryland PSC has no jurisdiction over the amount paid by WSSC in the condemnation of a private water and sewer company within the Washington Suburban Sanitary District. See *United Water New Mexico, Inc. v. New Mexico Pub. Utility Comm'n,* 121 N.M. 272, 910 P.2d 906 (1996) (holding that the determination of just compensation is a judicial function). Further, WSSC has not taken a firm position in the instant matter on the financial effect of its taking of the Systems on ratepayers in Marlboro Meadows, primarily because the acquisition cost was undetermined. We note that Article 29, § 3–107 dealing with WSSC condemnation of a privately owned water or sewerage system provides in subsection (b)(4) as follows:

"A building or premises actually connected in an adequate manner with the acquired private system at the time of its purchase is not required to pay the connection charge specified under § 6–101 of this article."

We also note that Article 29, § 5–104(c) provides:

"When the WSSC acquires an existing system, other than a municipal system, the WSSC may levy a front foot assessment less than the uniform front foot assessment levied in the sanitary district if:

"(1) The construction cost of the system has been added in whole or in part to the purchase of land that abuts on the system; and

"(2) The addition of the construction costs is a factor in the cost of the system to the WSSC."

The construction of this statute is not before us.

UIM's position is that, if WSSC considers the fair market value of the Systems to be too expensive, then the agency should abandon the condemnation.

point the developer will convey part of the land to a related utility company. Ultimately sales of lots will begin, the sales will go to settlement, partial releases will be given to the purchasers, and the developer will begin to pay down the loans. This process is inconsistent with a creation of a resulting trust.

This Court described the resulting trust in *Fitch v. Double "U" Sales Corp.*, 212 Md. 324, 129 A.2d 93 (1957), saying:

"It is well settled as a general rule that where the purchase price is paid by one person and the title is taken in the name of another, there arises in favor of the person paying the purchase money a resulting trust, and the holder of the legal title becomes a trustee for him. Of course, where a person attempts to establish a resulting trust, the burden is on him to prove such trust, and it must be made out by plain and unequivocal evidence, and the payment of the purchase money by the party claiming the trust before or at the time of the purchase is indispensable. The Courts should review parol evidence to establish such a trust with the greatest caution for it impeaches a solemn instrument executed according to law and recorded as an evidence of title. Any other rule would make insecure the title to real estate.... [T]he reasons for caution of the courts in approving this type of trust are manifest because there is a formal deed without any mention of a trust and reciting the payment of consideration. The deed is recorded and is a public record. The establishment of the resulting trust depends upon oral evidence sometimes supplemented by proof of conduct of the parties to overcome the record title. Also, an additional reason why the courts should be strict in this matter is the ease with which fraud can be worked on creditors by the use of this type of trust."

*Id.* at 330, 129 A.2d at 96 (citations omitted).

The typical CIAC scenario cannot be forced to fit the resulting trust model. The theory would have to be that the lot purchasers buy for their account the land that becomes the site of the water and sewerage systems but the lot purchasers cause the title of that site to be taken in the name of the

developer or the developer's utility. This scenario violates the "indispensable" element of a resulting trust that "the payment of the purchase money by the party claiming the trust [must be made] before or at the time of the purchase" of the land that is impressed with the trust. *Id.*

WSSC does not contend that there is an express trust and does not point to any document establishing one. Inasmuch as land would be part of any such express trust, there must be a writing that would satisfy the statute of frauds. See RP § 5–105.

 Nor do the facts here present a constructive trust. "The constructive trust, like its counterpart remedies 'at law,' is a remedy for unjust enrichment." 1 Dobbs, *Law of Remedies* § 4.3(2), at 597 (1993) (footnote omitted). The remedy "is no longer limited to misconduct cases; it redresses unjust enrichment, not wrongdoing." *Id.* There is no unjust enrichment here.

The original purchasers of homes or lots in Marlboro Meadows voluntarily paid whatever the agreed upon purchase price might have been for properties served by sewerage and water systems. Whether Hylton Enterprises, Inc. or First Maryland would have been unjustly enriched by First Maryland's being permitted to charge rates calculated on a base that included CIAC is not the issue that is before us. Clearly, UIM has not been unjustly enriched. It paid $200,000 to acquire the Systems from First Maryland about twenty years after the Marlboro Meadows development began. UIM also promised the PSC that it would make substantial capital improvements. *Re First Maryland Utilities, Inc.*, 76 Md. P.S.C. 175 (1985). UIM has made approximately $2 million of improvements to the Systems. It would expand the law of constructive trusts beyond all reason to hold that UIM was unjustly enriched at the expense of those who made the CIAC and to impose a constructive trust on the Systems in the hands of UIM.

Further, the more recent decisions of the United States Supreme Court have been particularly protective of property rights in the takings context. *See, e.g., City of Monterey v.*

*Del Monte Dunes,* 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (upholding a jury finding of a regulatory taking where a series of proposals to develop the property were denied and each time more rigorous demands were imposed); *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (development permit conditioned upon granting flood plain and public bicycle easement constituted taking for which compensation must be provided where not reasonably proportionate to the impact of proposed development); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (requiring landowners to give lateral beach easements to the public constituted taking for which just compensation must be provided); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (taking found even where the physical invasion of the television cable totaled a mere one and one-half cubic feet). *See also Phillips, supra,* 524 U.S. at 167, 118 S.Ct. at 1931, 141 L.Ed.2d at 185 (warning that "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under State law"); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1031, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798, 823 (1992) (cautioning that a " 'State, by *ipse dixit,* may not transform private property into public property without compensation . . . .' ") (citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 164, 101 S.Ct. 446, 452, 66 L.Ed.2d 358, 367 (1980)).

██ For these reasons we hold that Article 29, § 3–107(a), as applied to UIM in the instant matter, effects a taking of property without just compensation. Accordingly, the judgment of the Circuit Court for Prince George's County will be modified by restoring to the fair market value of the Systems as determined by the jury the $3.2 million erroneously deducted.

### III

The standard for valuing property taken in condemnation in Maryland is set forth in RP § 12–105(b) which, in relevant part, provides:

"The fair market value of property in a condemnation proceeding is the price as of the valuation date for the highest and best use of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay, excluding any increment in value proximately caused by the public project for which the property condemned is needed."

WSSC submits that the circuit court erroneously and prejudicially admitted evidence, principally through UIM's expert, Guastella, in which he presented values of the Systems derived from capitalizing income using a range of rates appropriate to a hypothetical governmental entity. WSSC argues that there was no evidence, as required, of a reasonable probability that an actual governmental body, other than WSSC, would purchase the Systems. In essence, WSSC contends that the relevant market is geographically limited to Prince George's County, Maryland, where there was no reasonable likelihood of an actual governmental purchaser, other than WSSC.

UIM argues that, under the valuation standard, which is fundamental to the art of appraising, appraisers must place themselves in the positions of the willing parties described in the standard. Thus, it was within the discretion of the circuit court to admit the disputed evidence.

After some pretrial skirmishing the circuit court rejected the reasonable probability argument in ruling on WSSC's motion *in limine*. At trial, when, on direct examination, Guastella addressed the income approach to value, the witness was asked:

"What market participants did you consider for purposes of the hypothetical willing buyer willing seller transaction that you used in order to value the Marlboro Meadows utility?"

Over objection the witness was allowed to testify as follows:

"In order to do a proper appraisal, you have to do the appraisal in full awareness of the market place. With

utilities, you essentially have two categories of the market place. You have investors and you have municipals.

"In terms of total water systems in the country, the municipals comprise 85 or more percent of all the ... community water systems that exist. The investor owned segment comprises a very small percentage. If you look at sales of utilities, the municipal acquisitions are at least three to every one sale of an investor to another investor. The market place is dominated by municipality acquisitions, not investor acquisitions.

"If you are going to do an appraisal and if you are going to capitalize income, you have to look to the market place. It's textbook analysis. You must look to the market place that exists. You cannot close your eyes to 85 percent or 75 percent of the market place, because in doing an income approach, you have to use a capitalization rate that reflects the market.

"Capitalization rate is a specialized term, but it essentially is what is the cost of money? How much interest you pay on debt, for example, would be a capitalization rate.

"If the municipals pay four and a half percent and five percent on debt and investors pay eight percent on debt and equity investments are 11 percent on debt, you have to measure the market average of all those capitalization rates and do an income approach for all of the market place or you do not have a valid appraisal."

WSSC's motion to strike was overruled, and Guastella was asked "to identify the categories of the potential municipal purchasers that would exist in this hypothetical willing buyer willing seller transaction?"

Over objection, the witness further testified:

"Yes. First of all, you are dealing with no negotiation. You are dealing with a hypothetical situation.

"We did not have a negotiation. So, the only reason we are in this room today is because we have to substitute a value for what would have happened if there were a real negotiation with [a] willing buyer [and a] willing seller.

"If you are going to do a hypothetical or calculated value, you are dealing with a hypothetical. The hypothetical that you are dealing with reflects a market place. The market place includes investor owned and municipal type utilities, what are included in the municipal acquisitions that have taken place, and there are many of them.

"You have counties and city acquired systems. You have home owner associations being forced to acquire systems. You have community development districts. You have water districts being formed to acquire systems. You have water authorities being formed to acquire systems. These are all the various types.

"You don't know who the buyer, investor buyer is. Just like if you sell your house, you don't know the name of the person who is going to buy your house. You want to establish a market value of your house and put it out on the market place for anybody who is willing to buy it.

"So, just as you don't have names of investors, you don't have particular names of municipal type entities including all that I described, counties, towns, cities, villages, home owners associations, water districts. But those are all the types of water systems that have acquired utilities.

"So, when you are doing an analysis as a substitute for a negotiated sale, you have to consider the entire market."

Overruling WSSC's motion to strike, the trial judge stated that he still was "not convinced about what this hypothetical market is all about" and that it "[s]ounds like a phantom market." Even so, he allowed the evidence because "this is something that is done in the practice in [the expert's field of] expertise."

The case principally relied upon by WSSC is *Olson v. United States,* 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). There, the United States, pursuant to a treaty with Great Britain, condemned land in Minnesota on the shores of, and on islands within, a lake. The lake was located in Minnesota and in the Canadian provinces of Ontario and Manitoba and had a superficial area of fourteen to fifteen

hundred square miles. *Id.* at 248–49, 54 S.Ct. at 706, 78 L.Ed. at 1241. The purpose of the taking was to increase the elevation of the lake in order to create a reservoir for one or more hydroelectric projects. The petitioners' land was actually used for agricultural purposes and could have been used for a fishing station. The petitioners claimed that the highest and best use of their land at the time of taking was as part of a hydroelectric reservoir and that a private investor-owned entity could effect that project. Addressing the petitioners' argument that opinion evidence of value as reservoir land was erroneously excluded, the Supreme Court said that fair market value is

> "the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth."

*Id.* at 257, 54 S.Ct. at 709, 78 L.Ed. at 1245–46 (citations omitted). Pointing to the fact that two countries were involved, that there were no comparable acquisitions without reliance on the power of eminent domain, and considering "the number of parcels, private owners, Indian tribes, and sovereign proprietors" with whom a private purchaser would have to deal, the Court held that the evidence was properly rejected. *Id.* at 260, 54 S.Ct. at 711, 78 L.Ed. at 1247.

■■■ The reasonable probability rule illustrated by *Olson* is primarily manifested in the decisions of Maryland appellate courts in condemnation cases in which the condemnee seeks to have the property valued on the basis of a higher use than that for which the property is zoned at the time of the taking. To admit evidence of the influence of that factor on present value, a zoning upgrade must be reasonably probable as of the applicable valuation date. *See J. William Costello Profit Sharing Trust v. State Roads Comm'n*, 315 Md. 693, 703, 556 A.2d 1102, 1107 (1989); *State Roads Comm'n v. Warriner*, 211 Md. 480, 484–85, 128 A.2d 248, 250 (1957); *State Roads Comm'n v. Kamins*, 82 Md.App. 552, 560, 572 A.2d 1132, 1136 (1990). *See also Lustine v. State Roads Comm'n*, 217 Md. 274, 282, 142 A.2d 566, 569 (1958) (" 'reasonable probability' of the use of the land for subdivision development").

■■■ In the instant matter, UIM does not seek a valuation reflecting the influence of a reasonably probable change in use. No change in use is planned by WSSC from the use under the UIM ownership.[10] Thus, the principle on which WSSC relies has no application here. WSSC's argument attempts to apply the reasonable probability rule to the identity of a purchaser. This is inconsistent with appraisal principles underlying RP § 12–105(b).

Nor was it error to admit Guastella's discussion of the hypothetical governmental market. Governmental bodies can acquire investor owned utilities in negotiated transactions. Discussing the statutory standard for determining value this Court said in *Board of Ed. v. Hughes*, 271 Md. 335, 317 A.2d 485 (1974):

"In order to form an opinion as to fair market value of a tract of land, an expert must place himself in the position of

---

10. After the taking, WSSC proposes initially to operate the Systems as free standing facilities. When the WSSC water main can be extended to serve Marlboro Meadows, the present UIM water system will be disconnected from its well source and connected to the main. Thereafter water distribution and sewerage collection and treatment under WSSC ownership will continue to use the former UIM facilities.

[a buyer and a seller as described in the statute]. Indeed, that is precisely what a jury must do in order for it to fix damages in an eminent domain proceeding."

*Id.* at 345, 317 A.2d at 491. 4 J.L. Sackman, *Nichols* (3d ed. rev.2000), discusses the difficulty of valuing special use property. The authors point out that, in such cases

"market value will not generally be the measure of compensation. However, it must be remembered that market value is always based on hypothetical conditions and *it is never necessary to show that a willing buyer and willing seller do in fact exist.*"

*Id.* § 12C.01[01], at 12C–2 to 12C–3 (footnotes omitted) (emphasis added).

The difference in values based on a capitalization of regulated or unregulated income were presented in *Massachusetts–American Water Co. v. Grafton Water Dist.*, 36 Mass.App.Ct. 944, 631 N.E.2d 59 (1994), where the governmental entity condemned a privately owned water utility that had supplied two Massachusetts towns since 1893. A witness called by the condemnor, using regulated income, valued the system at $1.3 million while an expert for the condemnee, "employing the income capitalization method, but in the substantially different context of a theoretical purchase by an unregulated buyer," opined to a value of $8.1 million. 631 N.E.2d at 60. After holding that the condemnor had waived objection to the testimony the court further stated:

"[T]here is also testimony from the [condemnee's] experts identifying potential unregulated purchasers both by name and classification, and referring to a trend of purchases of private water companies by public entities. The witnesses also cited the [condemnor]—which itself was authorized by its enabling legislation to purchase the [condemnee] and had, in fact, negotiated toward that end—as a potential unregulated buyer. *It is not necessary that a buyer actually planning to purchase the property in question specifically be identified.* The [condemnor] argues that cases dealing with consideration of potential uses of property taken by

eminent domain suggest that a judge must decide that there has been sufficient demonstration that assumptions utilized by expert witnesses are not unduly speculative, before permitting submission to the jury of valuation opinions based on those assumptions. To the extent that the judge implicitly made a determination that potential unregulated buyers existed, that conclusion found reasonable support in the evidence and did not constitute an abuse of discretion."

*Id.* at 61 (citations omitted) (emphasis added). If the evidentiary threshold for a "theoretical" purchase is simply the existence of a "potential" buyer, that foundation is established in the instant case by the existence of MES which could have purchased the Systems if WSSC had not taken the lead.

In any event, Guastella's discussion of the governmental market was admissible because it was relevant to the jury's evaluating the degree of reliability that could be placed on the income method in valuing utilities. That phase of the witness's testimony in substance created a strawman which the witness then knocked down, in an effort to minimize the weight of WSSC's expert testimony and to reinforce valuation by the RCNLD plus land method. These are not improperly prejudicial purposes.

Guastella explained that his review of actual negotiated transactions between privately owned utilities and governmental acquirers showed a wide fluctuation in capitalization rates and that it was necessary to try to determine appropriate capitalization rates from actual sales of utilities that were comparable to the Systems. Guastella "could not determine a market derived cost of capitalization or capitalization rate because [he did not] have the comparables that you need in a comparison of other utilities that are like Marlboro Meadows." Over WSSC's objection the witness presented the results of capitalizing the net income of the Systems at rates representing the cost of money to governmental borrowers, resulting in valuations ranging from $2.8 million to $15 million. Guastella said that, because there was no "market with which to establish a norm" for Marlboro Meadows, the range of valuations

was "so wide that you can't make a conclusive determination on this analysis alone as to what the market value is, which is textbook." The witness explained that the calculations were "an exercise that confirms what the textbooks show. That's why your capitalized income or an income approach is not the preferred method for specialty utility property." Further, when giving his ultimate conclusion, based on the RCNLD method plus land, that the value of the Systems was $11,295,000, Guastella again said that he had "come up with an income approach that does not give you reliable results."

There was no error in the circuit court's handling of this issue.

### IV

In this part we consider miscellaneous rulings on evidence that are raised in the WSSC appeal. Preliminarily, we repeat how this Court determines whether an erroneous evidentiary ruling in a condemnation case is prejudicial.

" 'Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice. This is especially true in condemnation proceedings. Such cases usually consume much time in trial, and are expensive in nature. As a rule, they are determined by a myriad of different items of evidence. The exclusion or admission of small items of evidence of doubtful materiality are not likely to be of great importance in the outcome of the case, and most courts refuse to set aside a verdict in cases of this kind, for error in the rulings on questions of evidence, unless, as indicated above, substantial prejudice be shown. 5 *Nichols, [Eminent Domain* ], Sec. 18.1[2].' "

*Hughes,* 271 Md. at 337, 317 A.2d at 486 (quoting *Hance v. State Roads Comm'n,* 221 Md. 164, 176, 156 A.2d 644, 650–51 (1959)).

### A

WSSC sought to call as a rebuttal witness the Prince George's County Director of Environmental Resources.

WSSC proffered that the witness would testify that "the County doesn't have the authority to create and operate a utility." After a lengthy colloquy at the bench, the court ruled that the nature and extent of the County's authority was a legal question on which the witness would not be permitted to testify, and the parties agreed that Prince George's County did not have the authority to condemn the Systems. The ruling was within the trial court's discretion and, in any event, was not prejudicial. The purported relevancy of the evidence was its tendency to show the improbability that a governmental entity in Prince George's County, other than WSSC, actually would acquire the Systems. Legally, WSSC's argument on the exclusion of the rebuttal witness is simply another manifestation of its reasonable probability argument, which we rejected in Part III hereof. Factually, there was no prejudice since MES was at least a potential buyer via negotiation.

### B

WSSC contends that the circuit court erred in permitting Guastella to testify that he considered external obsolescence in his ultimate valuation. WSSC defines external obsolescence as "the form of depreciation which accounts for external forces on the value of property," and WSSC contends that external obsolescence includes rate regulation. Brief of Appellant at 30. WSSC's ultimate point is that the failure to consider external obsolescence is fatal to all of UIM's evidence of value based upon the RCNLD method. The obstacle blocking WSSC from reaching that objective is Guastella's testimony that he considered external obsolescence and found that it did not exist under the facts of this case.

When Guastella so testified, WSSC made a general objection which was overruled. The alleged error identified in WSSC's brief in this Court is said to be that Guastella was testifying "to an opinion not contained in his report or in an answer to interrogatory propounded by the WSSC." Brief of Appellant at 30–31. There was not, however, any surprise or unfair prejudice.

The trial of the instant matter began January 24, 2000. The extract contains a legal memorandum by UIM served January 31, 2000, in opposition to WSSC's "Trial Memorandum Seeking to Exclude Testimony of Defendants' Experts." UIM's memo reflects that WSSC argued in its memo that the reports of UIM's experts had failed to address external obsolescence, and the UIM memo points to evidence arguably demonstrating how external obsolescence was handled by UIM's experts.[11] At trial the issue was one for the jury. WSSC was free to cross-examine Guastella on perceived discrepancies between, on the one hand, his report and his deposition testimony and, on the other, his trial testimony that external obsolescence was considered. There is no error.

C

The final issue concerns the values placed by Hartman on three classes of tangible personal property, consumables, inventory in stock, and general plant. Consumables include chemicals, such as chlorine and were valued at $13,615. Inventory in stock refers to pipes, joints, meters, etc. that are not actually in use, but are available to be used in repair or replacement. Hartman valued these at $38,765. General plant refers to motor vehicles, office equipment, furniture, records, etc. which were valued at $363,562. Consumables and inventory in stock may be considered together for purposes of WSSC's argument.

At trial WSSC's objection to the evidence of value of the consumables and inventory in stock was that Hartman had not done the appraisal and that, on deposition, "when we asked him about that item he stated he had no idea, or idea what the value of the consumables was." Hartman explained at trial that when making his March 1999 report he did not know what the trial date would be and that it was necessary for him to update his valuations to January 2000. The revised numbers were furnished to WSSC two days prior to trial. Actual-

---

11. The extract does not indicate any pretrial ruling on this issue.

ly, in his January review, Hartman reduced the value of the consumables from his prior report. The trial court ruled that the two classes of property had been included in the report, that it was entirely proper to update the values, and that the evidence would be admitted.

In this Court WSSC compares Hartman's deposition testimony with his testimony at trial. As indicated above, that may be an appropriate exploration for cross-examination at trial, with respect to credibility, but the circuit court acted well within its discretion in ruling that there was no surprising deviation from the report.

At trial WSSC referred to a specific passage in Hartman's deposition, but the court made its ruling without having the passage presented to it. The passage does not support WSSC's above-quoted characterization of Hartman's deposition testimony. At his April 23, 1999 deposition Hartman essentially testified that "we" had gone to the Systems, inspected the items, realized that it was not cost efficient to do "incredible detail," utilized the acquisition cost of UIM, and estimated "how much they typically have of various different things." Hartman was then asked, "So, sitting here today, you don't have an opinion as to the value of the consumables?" He replied, "At this point in time, there is a value, the extent of the value, I don't know." An objective reading of the answer, in context, reflects that the witness did not have an opinion of value of these fluctuating items of personalty at the time the deposition was being taken.

With respect to general plant property, after Hartman had described at trial what was included in that class, he was asked for his opinion of its value. WSSC interposed a general objection which was overruled. Based on what was immediately before the trial judge, the ruling was proper. Even if the trial judge were required to divine that the basis for the objection was something in Hartman's deposition, there was no error. On deposition Hartman had explained that the valuation was derived in large part from the information in the annual report submitted, under oath, by UIM to

the PSC and in part from a "typical industry estimate" for a system of the size of UIM's.

## V

Pursuant to Maryland Rule 8–604(b) we shall modify the judgment of the Circuit Court for Prince George's County to restore the deduction from the jury's award that was made by the court to reflect CIAC. In all other respects the judgment will be affirmed.

*JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY MODIFIED TO AN AWARD OF $9.7 MILLION. IN ALL OTHER RESPECTS THE JUDG-MENT IS AFFIRMED. COSTS ON THE APPEAL AND CROSS APPEAL TO BE PAID BY WASHINGTON SUB-URBAN SANITARY COMMISSION.*